677 A.2d 1106

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JOHN MARTINI, SR., DEFENDANT–RESPONDENT.

Argued May 29, 1996—Decided June 28, 1996.

*Claudia Van Wyk,* Deputy Public Defender II, argued the cause for appellant, Office of the Public Defender (*Susan L. Reisner,* Public Defender, attorney).

*Alan L. Zegas* argued the cause for respondent, John Martini, Sr.

*Susan W. Sciacca,* Special Deputy Attorney General, Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (*Charles R. Buckley,* Deputy Attorney General in charge, Acting Bergen County Prosecutor, attorney).

*David A. Ruhnke* argued the cause for amicus curiae The Association of Criminal Lawyers of New Jersey (*Ruhnke & Barrett* and *Crummy Del Deo Dolan Griffinger & Vecchione,* attorneys; *Mr. Ruhnke* and *Lawrence S. Lustberg,* on the brief).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Deborah*

*T. Poritz,* Attorney General, attorney; *Ms. Foddai* and *Craig V. Zwillman,* Deputy Attorney General, of counsel; *Mr. Zwillman,* of counsel and on the brief).

The opinion of the Court was delivered by

O'HERN, J.

It is difficult to explain why a murderer who has admitted his guilt and had his conviction and sentence of death affirmed on direct appeal should not be granted his request to be executed immediately. For some, no explanation may be necessary. For others, no explanation will suffice. For those who wish to understand, we explain that under our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes that determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants.

# I

The specific question is whether to grant John Martini's request to dismiss the Office of the Public Defender's application for post-conviction relief filed on Martini's behalf but without his consent. The facts of Martini's case are set forth in detail in our two prior decisions, *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993) (*Martini I* ), and *State v. Martini,* 139 *N.J.* 3, 651 *A.*2d 949 (1994) (*Martini II* ).

Briefly, Martini kidnapped Irving Flax, a Fair Lawn business executive in 1989. He telephoned Flax's wife and demanded ransom money. Despite receiving the ransom money, Martini shot Mr. Flax in the back of the head three times, the jury found to prevent Flax from identifying him. A jury convicted Martini of, among other offenses, purposeful and knowing murder over his claim of drug dependency or diminished capacity and sentenced him to death. We affirmed his conviction of murder in *Martini I* and the proportionality of his sentence of death in *Martini II.*

On October 2, 1995, the United States Supreme Court denied Martini's petition for certiorari. *Martini v. New Jersey,* —— *U.S.* ——, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137. The following day, the Law Division issued a warrant for defendant's execution, to take place on November 15, 1995. On October 30, 1995, the Public Defender applied to the Law Division for permission to pursue post-conviction relief on defendant's behalf over his objection, or for an evidentiary hearing on his competency, as well as for a stay of execution pending post-conviction relief proceedings. At a hearing that same day, the Public Defender acknowledged that defendant did not wish to stay his execution or seek any post-conviction relief. Defendant informed the court that this was correct. With his consent, the court appointed independent counsel for defendant from a list supplied by the Public Defender. The Court also appointed a psychiatrist to examine defendant to determine his competence to waive post-conviction proceedings. On February 14, 1996, at the conclusion of a two-day competency hearing, the trial court ruled that defendant was competent to waive post-conviction proceedings, and that the Public Defender could not seek post-conviction relief on defendant's behalf over his objection. The trial court continued the stay of defendant's execution pending review by this Court. The Public Defender appealed the denial of her motion to pursue post-conviction relief. We expedited review of the matter and held oral argument on May 29, 1996.

## II

Although the context differs, the issues are essentially the same as those that we faced in *State v. Koedatich,* reported at 98 *N.J.* 553, 489 *A.*2d 659 (1984) *(Koedatich I )*, and 112 *N.J.* 225, 548 *A.*2d 939 (1988) *(Koedatich II )*, *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989), and *State v. Hightower,* 120 *N.J.* 378, 577 *A.*2d 99 (1990). In those cases, each defendant asked either that no mitigating evidence be presented on his behalf, that he be permitted to ask the jury to sentence him to death immediately, or that no appeal of his sentence of death be taken. Koedatich

attempted to waive a jury during the penalty phase and instructed his attorney to introduce no mitigating evidence. *Koedatich II, supra*, 112 *N.J.* at 327, 548 *A.*2d 939. Defense counsel followed those instructions and made neither an opening nor closing statement, and presented no evidence in the penalty phase. *Ibid.* After the jury imposed the sentence of death, the Public Defender filed an appeal on Koedatich's behalf over his objection. An automatic stay of Koedatich's execution was entered. Koedatich asked this Court to vacate the stay of his execution and to dismiss the appeal that the Public Defender had filed on his behalf. *Koedatich I, supra*, 98 *N.J.* at 553, 489 *A.*2d 659. He asked to be executed immediately. We denied Koedatich's motion to dismiss his appeal or to vacate the stay of execution, but ordered that in addition to the appeal prosecuted by the Public Defender, the defendant might secure other counsel or proceed pro se in order to raise such argument on the appeal as he might feel necessary or appropriate. *Ibid.* The Public Defender prosecuted a successful appeal on Koedatich's behalf. In our decision of that appeal, we set forth the reasons for our earlier decision that the Public Defender's appeal should not be dismissed. We noted that "persuasive policy reasons exist for not allowing a defendant in a capital case to execute even a knowing and voluntary waiver of his right to present mitigating evidence during the penalty phase. These policy reasons are based substantially on the State's 'interest in a reliable penalty determination.' " *Koedatich II, supra*, 112 *N.J.* at 329–30, 548 *A.*2d 939 (quoting *People v. Deere*, 41 *Cal.*3d 353, 222 *Cal.Rptr.* 13, 19, 710 *P.*2d 925, 931 (1985)). We also quoted with approval the Appellate Division's interlocutory opinion in the *Hightower* case [1] in which the court allowed a defense attorney to present mitigating evidence even over the

---

[1] When we reviewed the *Hightower* case on direct appeal, we approved the procedures set forth in the Appellate Division opinion. Hightower was permitted to ask the jury that he be sentenced to death. However, his sentence of death had to be vacated because the jury had been instructed that it had to be unanimous in finding any mitigating factors. 120 *N.J.* at 386, 577 *A.*2d 99. At his second trial he did not ask to be sentenced to death.

client's express order not to contest the imposition of the death sentence:

Certainly tension exists between the desires of the client as expressed to his lawyer and the constitutional necessity to insure that the ultimate penalty is not extracted in a "wanton and freakish manner." In normal circumstances, the lawyer is required by the Rules of Professional Conduct to "abide by a client's decisions concerning the objectives of representation."

.         .         .         .         .         .         .         .

Under our statutory scheme, a jury may impose the death penalty only if the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. If the jury did not hear the evidence allegedly in mitigation, it could have difficulty discharging its statutory, and indeed moral, duty. Our conclusion is reinforced by a recent amendment to the death penalty statute which requires that an appeal must be taken even if defendant does not want to appeal and that our State Supreme Court must review the issue of proportionality of the sentence on defendant's request.

[*Koedatich II, supra,* 112 *N.J.* at 330, 548 *A.*2d 939 (quoting *State v. Hightower,* 214 *N.J.Super.* 43, 44–45, 518 *A.*2d 482 (App.Div.1986)).]

The *Koedatich* Court explained: "Essential to our [capital punishment] statute is that its application cannot result in death sentences that are 'wantonly and ... freakishly imposed.'" 112 *N.J.* at 331, 548 *A.*2d 939 (quoting *Furman v. Georgia,* 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762–63, 33 *L.Ed.*2d 346, 390 (1972) (Stewart, J., concurring)). Our procedures for trial and appeal are established

not only to protect the interests of the accused, but also to enable a state to enact a constitutional death penalty statute.... A defendant who prevents the presentation of mitigating evidence "withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling." *People v. Deere, supra,* 222 *Cal.Rptr.* at 19, 710 *P.*2d at 931.

Courts have recognized that the qualitative difference between death and any other penalty gives rise to "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961. It is self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty. Accordingly, we have the constitutional and statutory duty to review every judgment of death.

[*Id.* at 331–32, 548 *A.*2d 939 (citation omitted).]

Thus, under our law a defendant may not waive a sentencing hearing, may not waive the presentation of mitigating evidence, and may not waive an appeal. The question is whether a defendant who has presented mitigating factors to a jury and has had his conviction and sentence affirmed on direct appeal may waive post-conviction relief (PCR). The answer depends on the importance of post-conviction relief to ensuring the reliability and integrity of death sentences imposed in New Jersey.

We strongly disagree with the position of the Public Defender that Martini has had only half an appeal. Post-conviction relief is not in any sense a half appeal. We have repeatedly emphasized that post-conviction relief is not a substitute for a direct appeal. *State v. Mitchell*, 126 *N.J.* 565, 583, 601 *A.*2d 198 (1992) (citations omitted). *Rule* 3:22–4 sharply limits what may be raised on PCR.

> The State has a strong interest in achieving finality. Without procedural rules requiring the consolidation of issues, litigation would continue indefinitely in a disconnected and piecemeal fashion. Each time a petitioner brought forward a new issue, attorneys and courts would waste their limited resources acquainting themselves with all of the complex details necessary to adjudicate it. When the grounds for challenging a conviction are consolidated, that investment need occur only once, and judicial resources can be more efficiently used to decide cases in a timely fashion.
>
> [*Mitchell, supra,* 126 *N.J.* at 584, 601 *A.*2d 198.]

On the other hand, there are some issues that one simply cannot raise on direct appeal and other issues that are best raised on PCR. "Ineffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." *State v. Preciose*, 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992) (citations omitted). Other particularly well-suited claims arise when "new case law has changed the applicable standards and should be retroactively applied to the case [undergoing post-conviction review]," when "the challenge is to the appellate proceedings themselves," or when "the claim is based on testimony outside of the trial court that could not have been raised on direct appeal." *Mitchell, supra,* 126 *N.J.* at 585, 601 *A.*2d 198. Examples of claims that are often based on facts outside the record include claims based on

*Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963) (failure to disclose exculpatory evidence), and ineffectiveness of counsel claims.

In her 1995 Madison Lecture at New York University, Judge Betty B. Fletcher of the Ninth Circuit gave two examples of the need for post-conviction relief. Betty B. Fletcher, *The Death Penalty in America: Can Justice be Done?,* 70 *N.Y.U.L.Rev.* 811, 822 (1995). The first involved Randall Adams. Mr. Adams was tried and convicted for the murder of a Dallas police officer. Subsequent events revealed significant questions about the evidence used to convict him. That evidence prompted the court to grant a post-conviction hearing that resulted in one of Adams' chief accusers confessing to the crime. *Ibid.*

The second involved Clarence Brandley. An all-white jury sentenced Brandley to death for the rape and murder of a white student from the high school where Brandley worked as a janitor. The conviction was based on circumstantial evidence. After Brandley's conviction, the ex-wife of a white janitor from the same high school informed authorities that her former husband had admitted committing the crime. In a PCR hearing, a state court judge reviewed that new information, along with statements of others who had come forward, and ordered a new trial. *Ibid.* These men, unlike Martini, were innocent and protested their innocence. The point is that without post-conviction relief procedures they would have been executed. Of course, such examples of successful petitions for PCR are rare. Many PCR petitions do seek only to rerun the trial. The problem lies in separating the wheat from the chaff.

In this case, the Public Defender informs us that there are three issues that defendant could not have raised on direct appeal: (1) a defense based on certain undisclosed confidential information that has been imparted to the Public Defender and presumably was not disclosed to the jury below; (2) a new constitutional principle announced by the Supreme Court after Martini's trial in *Simmons v. South Carolina,* 512 *U.S.* ——, 114 *S.Ct.* 2187, 129

*L.Ed.*2d 133 (1994); and (3) evidence disclosed after Martini's conviction that suggests that New Jersey's death penalty system may be constitutionally flawed because of systemic discrimination against blacks and other minorities.

We are obviously unable to assess the significance of the first issue because we do not know the nature of the confidential information. We do know that the Public Defender received this information as attorney for Martini and may be obliged to respect the confidences of her client. Presumably there will be an in camera hearing. The trial court will have to balance the interests of the client against any public interest in the disclosure of the information.

Concerning the second issue, *Simmons, supra,* held that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole." 512 *U.S.* at ——, 114 *S.Ct.* at 2198, 129 *L.Ed.*2d at 147. In *Martini I,* defendant argued that the trial court should have instructed the jury that it would sentence Martini to consecutive terms for the murder and kidnapping, thus assuring that he would die in jail. 131 *N.J.* at 308–09, 619 *A.*2d 1208. Martini's defense counsel did make the argument that defendant was not likely to live long enough to be released after a thirty-year period of parole ineligibility. Defendant was sixty years old at the time of trial. Having served more than a year in jail prior to trial, his release, at the earliest, would have come as he approached ninety. The jury was well aware of those circumstances. *Id.* at 308, 619 *A.*2d 1208. Based on that record, the lack of defense counsel's request, and the jury's knowledge of the practical consequences of defendant's life sentence, the Court found no error in the trial court's failure to instruct the jury about defendant's potential consecutive sentence for his kidnapping conviction. *Id.* at 313, 619 *A.*2d 1208. The issue is similar, but not identical, to the one raised in *Simmons.* In any event, disposition of the issue should not require extended proceedings.

The third issue, if meritorious, would fit within a traditional category for which post-conviction relief would be granted. The State does not dispute that the new data on capital sentencing make this an issue that could be raised only on post-conviction relief. Rather, the State argues that the Public Defender has no standing to raise the issue on defendant's behalf because defendant has waived the issue.[2] The problem is that the judiciary is constitutionally involved in the administration of the death penalty; the judiciary issues the death warrant. *N.J.S.A.* 2C:49–5; Judges Bench Manual for Capital Cases, March 10, 1995 (Appendix N). Thus, the question is not whether the Public Defender has standing to raise an issue on behalf of the defendant, but whether the judiciary, in the discharge of its "constitutional and statutory duty to review every judgment of death," *Koedatich II, supra,* 112 *N.J.* at 332, 548 *A.*2d 939, must consider the issue in order to ensure the reliability of the decision to execute. Consequently, we need not debate or decide the differences between standing under Article III of the United States Constitution and under Article VI of the New Jersey Constitution. *See Crescent Park Tenants Ass'n v. Realty Equities Corp.,* 58 *N.J.* 98, 107–08, 275 *A.*2d 433 (1971) (explaining that "overall [in evaluating standing] we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of 'just and expeditious determinations on the ultimate merits.' ") (citations omitted).

In *Gilmore v. Utah,* 429 *U.S.* 1012, 97 *S.Ct.* 436, 50 *L.Ed.*2d 632 (1976), the United States Supreme Court declined on standing grounds to consider an appeal by Gary Gilmore's mother that the Utah death penalty act was unconstitutional. That approach may be constitutionally permissible for the United States Supreme

---

[2] The record is not clear whether Martini expressed the wish to be executed if he were the only person to be executed under the State's capital punishment law. As we understand the record, he wishes to avoid delaying the inevitable, not to be the only death row inmate to be executed.

Court because it is not part of a state system of administration of the death penalty. In contrast, the New Jersey judiciary is an integral part of the administration of the death penalty. There are three requirements for the constitutionality of a death penalty statute: (1) that sentencers be "given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision," *Gregg v. Georgia*, 428 *U.S.* 153, 192, 96 *S.Ct.* 2909, 2934, 49 *L.Ed.*2d 859, 885 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), (the aggravating and mitigating factors); (2) that there be an individualized determination of the sentence on the basis of the character of the individual and the circumstances of the crime, *Eddings v. Oklahoma*, 455 *U.S.* 104, 110–12, 102 *S.Ct.* 869, 874–75, 71 *L.Ed.*2d 1, 8–9 (1982); and (3) that "the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously...." *Gregg, supra*, 428 *U.S.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 886–87.

Unless we regard as meaningless the procedures for post-conviction relief set forth in our Rules of Court, even were there no Office of the Public Defender in New Jersey, we would undoubtedly be required to appoint standby counsel for defendant in order to perform a "meaningful appellate review" of his death sentence. Because the issues potentially raised in a PCR petition are so varied and important, "[f]rom our state perspective, finality is achieved [only] when our courts grant or deny post-conviction relief." *Preciose, supra*, 129 *N.J.* at 475, 609 *A.*2d 1280. This is because when "meritorious issues are presented, our interest in affording defendants access to both state post-conviction and federal habeas review outweighs our interest in finality.... Simply put, considerations of finality and procedural enforcement count for little when a defendant's life or liberty hangs in the balance." *Id.* at 475–76, 609 *A.*2d 1280.

We acknowledge that other jurisdictions do not recognize the standing of one such as the Public Defender to prosecute a post-conviction relief application on behalf of a death row inmate who

does not seek their assistance. It is a natural reaction for some to wish to be rid of an admitted murderer who asks to be executed. The Court is nonetheless required to ensure the integrity of death sentences in New Jersey. In *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987), we said that Article I, paragraph 12 of the New Jersey Constitution requires "consistency and reliability" in enforcement of the death penalty. There can be no illusions for us that there is a bureaucracy of death that discharges for us that responsibility. Ralph P. Hummel, *The Bureaucratic Experience* 90–93 (2nd ed. 1982). The Court must decide if issues that could not be raised on direct appeal make the prisoner's sentence of death unconstitutional or illegal.

Of course, we cannot stay scheduled executions for each new issue that arises. There must be an end to the process. We recognized in *State v. Marshall,* 130 *N.J.* 109, 219, 613 *A.*2d 1059 (1992), that someone will die before every avenue of inquiry will have been ended: "Ours is a finite role defined by our obligation to see that justice is done at a given time." Consequently, for capital defendants who do not desire post-conviction review, we tailor the process to the limited demands of integrity and reliability, establishing the following truncated procedure. There shall be one proceeding. Such post-conviction relief will be limited to matters that have always been capable of being raised in post-conviction relief, even when procedurally barred, such as newly discovered evidence of innocence, unconstitutionality, or illegality of a death sentence. In addition, we shall specifically require accelerated disposition of any such claim, both in the interest of the defendant who wishes to conclude the appeal process as soon as possible, and in the interest of the public that seeks to know that justice is done.

We direct that a PCR application for a capital defendant opposed to PCR be filed by the Public Defender or other designated counsel within thirty days after knowledge that a defendant does not wish to pursue post-conviction relief. (In this case, within thirty days of today.) Standby counsel should be appointed

to represent the interests of one such as Martini. We direct that the Assignment Judge of the vicinage assign the petition to a judge capable of conducting the proceedings on a continuous day-to-day basis from the date of the assignment. *Preciose, supra,* 129 *N.J.* at 462, 609 *A.*2d 1280, outlines the circumstances in which a PCR court may dispose of a petition without a hearing. We direct that the Administrative Office of the Courts provide to the trial court the services of a computer-assisted court reporter so that transcripts may be generated simultaneously with the proceedings. Upon the conclusion of any hearings, we direct that the judge conducting the post-conviction relief proceedings immediately certify to the Supreme Court the transcribed record and copies of any exhibits and briefs filed in the Law Division. The trial court may render its decision either orally from the bench or by written opinion promptly after the conclusion of the hearings, as did the trial court below. An aggrieved party must file with the Supreme Court its notice of appeal with any supplemental briefs within fifteen days after the trial court's ruling. The Court shall thereafter render its own decision within forty-five days of receipt of the notice of appeal and any supplemental briefs or within thirty days of any scheduled oral argument.

That abbreviated hearing schedule for capital defendants who do not desire PCR will enable the Court to determine whether waiver of PCR will result in an execution that would be unconstitutional or illegal. Some issues may not be amenable to summary disposition. The one issue in this case that would require further consideration is an issue of constitutional dimension that has been raised directly in the appeal of Joseph Harris, which will be argued before the Court on September 10, 1996. That issue concerns a challenge to the constitutionality of the death penalty based on recent data that suggests that New Jersey's death penalty may be constitutionally flawed because of systemic discrimination against blacks and other minorities. In *Harris,* the defendant argues that the statistics gathered by the Administrative Office of the Courts "establish that the race of the defendant is a strong factor in explaining why some defendants get life

sentences and others get death, to a sufficient significance as to implicate the State Constitutional guarantees of equal protection and protection from cruel and unusual punishment."

"New Jersey's history and traditions would never countenance racial disparity in capital sentencing." *Marshall, supra,* 130 *N.J.* at 207, 613 *A.*2d 1059. The Court is the appropriate branch of government to vindicate that tradition and our own constitutional guarantee of equal protection of the laws under Article I, paragraph 1 of the New Jersey Constitution. In *Marshall,* we specifically reserved the power to re-evaluate the constitutionality of the death penalty statute if statistical evidence were to illustrate a racial disparity in death sentences. *Id.* at 212–14, 613 *A.*2d 1059. Plenary briefs have been filed on the issue by Harris and the State. Consequently, Martini's PCR court may take judicial notice of the pending appeal and its effect on Martini's case. Both majority and dissent agree that a stay of Martini's execution until that date would be in order.

The Attorney General acknowledges that her office would not seek to have a prisoner executed by waiver under a system of laws later determined to be unconstitutional. She believes firmly, however, that there is no question of constitutionality and thus no waiver of any procedures that assure the reliability of a death sentence. The Bergen County Prosecutor acknowledges in her brief that there is a narrow class of cases in which PCR would be institutionally required even over a prisoner's objection, as when there was newly-discovered evidence of innocence or when the death penalty had been declared unconstitutional. She cites *Commonwealth v. McKenna,* 476 *Pa.* 428, 383 *A.*2d 174, 177 (1978), in which the Pennsylvania Supreme Court held that because the State's death penalty statute was declared unconstitutional, defendant's death sentence "must be vacated, appellant's professed desire to the contrary notwithstanding." If, then, there are exceptions to the doctrine that a capital defendant may waive all rights to PCR, standing is not a conceptual obstacle to the administration of justice. Thus, it is not issues of standing or

waiver that determine the matter but whether the Court provides meaningful appellate review of a capital sentence when it authorizes the execution of a prisoner at the same time that it is considering whether the Death Penalty Act is constitutional. It seems to us that the answer to that question must be no unless we no longer believe that it is "self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty." *Koedatich II, supra,* 112 *N.J.* at 332, 548 *A.*2d 939.

We have considered the other issues raised concerning the competency of Mr. Martini. We are satisfied that the trial court correctly resolved on the basis of psychiatric evidence before it that Martini is competent to make this decision and has voluntarily expressed a desire to prosecute no further appeals. We respect his choice. We have a constitutional responsibility to ensure reliability in the implementation of the death penalty. We shall discharge that responsibility with dispatch. We have accelerated the argument and decision of this appeal and will continue that practice until the matter is resolved.

Finally, we conclude that the trial court was correct to order the Public Defender to pay for the cost of the court-appointed psychiatric expert who evaluated Martini. "In *In re Cannady,* 126 *N.J.* 486, 600 *A.*2d 459 (1991), . . . we held that the Public Defender Act mandates that the OPD [Office of the Public Defender] pay for expert services that are necessary to any indigent defendant's case." *In re Kauffman,* 126 *N.J.* 499, 501, 600 *A.*2d 465 (1991). An expert evaluation of Martini's competence, like his representation by private counsel, is a service necessary to defendant's case. The trial court has an independent interest in assessing Martini's competence. It is not unfair to permit the court to impose those fees on the OPD. We are confident that there will be no abuse of that authority at the expense of the OPD budget.

The judgment dismissing the post-conviction application is reversed and the matter is remanded to the Law Division for further proceedings in accordance with this opinion.

COLEMAN, J., dissenting.

Due to the unique facts in this case that indicate that defendant is competent and that he has made a voluntary, knowing, and intelligent waiver of his right to pursue post-conviction relief, I dissent from the Court's holding that defendant cannot waive his right to prosecute a post-conviction relief application.

I

On October 3, 1995, one day after the denial of certiorari, the trial court issued a death warrant setting defendant's execution for November 15, 1995. Although defendant expressed his desire not to pursue post-conviction relief, the Office of the Public Defender filed a motion for permission to pursue post-conviction relief over defendant's objection. The public defender also sought a stay of execution pending the projected petition for post-conviction relief and an evidentiary hearing on defendant's competence.

On October 30, 1995, the trial court held a hearing on the motions. The public defender argued that it should be permitted to pursue a petition for post-conviction relief in the absence of defendant's consent. Furthermore, the public defender challenged defendant's competence and the voluntariness of his decision. The trial court questioned defendant extensively at that hearing. Defendant responded affirmatively when asked whether he thought he had received a fair trial and whether his death sentence was proper. Defendant indicated that the public defenders had discussed the post-conviction relief process with him, and had explained that they might be able to present certain arguments to the court that could prevent defendant's execution, at least temporarily. Defendant further indicated his wish that the public defenders not file a petition for post-conviction relief on his behalf. When asked why, defendant replied:

I think that living in jail is terrible to live there, I have been locked up 7 years now and it's been murder and everything is always publicity about this thing so I have enough trouble with my family, I want to do it for once and get it over with.

Additionally, defendant stated that although his former wife "told [him] to do what [he] feel[s] is right," no one was forcing him to make those decisions. Defendant also indicated his understanding that the governor can decide to exercise the power of clemency.

At the close of the hearing, the court issued a temporary stay of execution, and appointed Dr. Azariah Eshkenazi, a psychiatrist, to examine defendant on behalf of the court. By order dated November 8, 1995, the court appointed Alan L. Zegas to represent defendant. In a subsequent order dated November 17, 1995, the court ordered all relevant records to be released to Dr. Eshkenazi and Mr. Zegas.

On December 7, 1995, and January 4, 1996, defendant submitted two affidavits in which he reiterated his desire to forego post-conviction relief and have the death penalty imposed. In his affidavit dated December 7, 1995, defendant states:

6. Mr. Smith and Mr. Friedman [public defenders] have fully described to me the reasons they have for wanting to file a petition for post-conviction relief for me, and they have outlined to me the arguments they intend to make on my behalf. I understand what they want to do and why they want to do it, and I appreciate their good intentions. I have instructed Mr. Smith and Mr. Friedman, however, to not file the proposed petition because I wish to be executed. In giving out this instruction, I am freely, knowingly and voluntarily giving up any right I may have to further review of the judgment of conviction by any court. I further understand that by giving up any right to further review, I am increasing the chance that I will be executed quickly. This is what I want.

7. I have, for a long time, given a lot of thought to whether I wished to continue challenging the judgment of conviction. Approximately two years ago, I decided that I would prefer being put to death over spending the rest of my life in jail or delaying the time for my execution. In my view, any legal challenge will ultimately prove to be useless. Continuing the appeals process only creates more uncertainty for me as to when exactly I will die. I no longer wish to live with this uncertainty and I no longer wish to continue to exist under the hellish conditions I am existing under in prison.

8. In my view, death is preferable to the day-to-day conditions I have to endure on death row. I have almost no contact with people. I am confined to a dirty cell in which there are mice and rats. When I leave my cell, I am strip searched. The

food I am given to eat is bad and not tolerable. I have not had visitors from any family members for over 6 years. The longer I live, the more my family name is damaged by publicity about my crime.

9. I committed the murder of Irving Flax and I did this deliberately, knowingly, intentionally and willfully. The verdict of the jury was correct. I have no excuse for my crime and I was not adversely effected by drugs or alcohol at the time I committed it. I fully understood what I was doing, and I was not operating under a diminished capacity. I had a clear mind. I also knew what the potential consequences were for the murder I committed, and I knew that those consequences included the death penalty. Although I am facing execution, I have never been opposed to the death penalty on moral, religious or other grounds.

10. My decision to die and to have no further challenges raised to the judgment of conviction is my own decision and has been made by me after thinking carefully about life and death, the conditions I am living under, and the chance I have of ever regaining my freedom. Though I am currently taking certain prescribed medications, I do not feel that these medications have, in any way, effected my ability to make a clear decision about what I want to do with my life.

11. In addition to death being preferable to the conditions I am currently living under, I further believe that I have a greater chance for religious absolution if I acknowledge my crime and take no further legal action to prevent my death. In my view, the action that the public defender wishes to take on my behalf will only delay the time for my death, cause my victim's family more pain, and cause me to endure for a longer time the intolerable conditions I am living under in prison.

On February 13 and 14, 1996, a hearing was held to determine defendant's competence to waive his right to file a petition for post-conviction relief. The court took testimony from Dr. Eshkenazi, the court-appointed expert, and Dr. Kenneth Weiss, the public defender's expert. Defendant also testified.

Dr. Eshkenazi diagnosed defendant as suffering from a "life circumstance," and concluded that defendant was not suffering from schizophrenia. Dr. Eshkenazi opined that defendant has the capacity to make a rational choice with respect to continuing or abandoning his further appeals.

Dr. Eshkenazi reported that at the time of his evaluation of defendant, defendant was taking the following minimal doses of medication: 25 milligrams of Mellaril, an anti-psychotic tranquilizer, twice a day; 25 milligrams of Thorazine, an anti-psychotic, at bedtime, and 100 milligrams of Sinequan, an anti-depressant, at bedtime. According to Dr. Eshkenazi, those low doses of Mellaril and Thorazine sedate defendant and help him sleep better. The

doctor indicated that defendant behaved as though he was not taking any medication. When asked about the combined effect of the three medications, Dr. Eshkenazi responded:

> I believe that they have really calmed him down. They enable him to think a little better maybe and he's—and they have enabled him to survive in the jail system.

Dr. Eshkenazi stated that he "did not see any psychiatric condition or illness that would interfere with [defendant's] ability to make rational and competent decisions." He further stated that defendant denied ever having any visual or auditory hallucinations, and stated that his examination revealed no mental illness, defect, or psychoses. While observing the possibility that defendant may suffer from depression, Dr. Eshkenazi "did not see clinical symptoms of depression."

On cross-examination, the public defender challenged Dr. Eshkenazi with defendant's prior prison medical records, in which Dr. Guy, the prison psychiatrist, had repeatedly notated, "Schizophrenia, chronic, medication control paranoia and voices. Medication: Mellaril 50 milligram[s] in the morning, 50 milligram[s] at bedtime and Thorazine, 50 milligram[s at] bedtime times 60." Dr. Eshkenazi responded that Dr. Guy practiced "poor psychiatry," because he had spent only a few minutes at a time with defendant,[3] recorded no symptoms, and provided no explanation of the diagnosis of schizophrenia. Dr. Eshkenazi stated that because Dr. Guy failed to substantiate his opinion, Dr. Eshkenazi gave that opinion little weight. Further, Dr. Eshkenazi explained that if defendant was actually schizophrenic, then the medical doses would not be sufficient to treat the schizophrenia because of the tolerance for medications that defendant had built up over many years of taking drugs. Dr. Eshkenazi added that when Mellaril and Thorazine are used to treat schizophrenia, they are typically prescribed in doses ranging from 400 to 600 milligrams per day, and 600 to 4,000 milligrams per day, respectively.

---

[3] Defendant testified that Dr. Guy meets with him approximately four times a year for approximately five minutes at a time.

Dr. Weiss described defendant as cooperative, but not spontaneous or forthcoming in providing information. He stated that defendant has a "restricted emotional expression," that is seen frequently among people treated with anti-psychotic medications like those taken by defendant. Dr. Weiss remarked that defendant exhibited a slowness of movement sometimes associated with anti-psychotic medication.

On the subject of defendant's desire to die, Dr. Weiss indicated in his report that defendant had "ma[de] a case for being executed," which he explained to mean that defendant "did everything he could to throw me off the trail of any psychiatric conditions." The doctor stated:

> [I]t's pretty clear to me that Mr. Martini is depressed, that he has sad mood[s], that he's lost his will to live and whatever one might think about whether that is completely rational or not rational, it's fairly clear to me that his mood was low, he was despondent. The only thing he hoped for was that he could prevail in this legal setting so that he would come closer to his execution date.

On cross-examination, Dr. Weiss conceded that the realities of prison life and the uncertainty faced by a death row inmate would tend to make the average person depressed and suicidal.

Dr. Weiss testified that defendant's current drug treatment is consistent with Dr. Guy's diagnosis of chronic schizophrenia. He stated, however, that "the symptoms of schizophrenia if present were not strong enough for me to draw any independent conclusions about whether [defendant] in fact has [schizophrenia]." Dr. Weiss concluded that defendant is suffering from depression and that the medication he is taking is inadequate to treat it. Dr. Weiss indicated that defendant's current medication could actually lower his mood and deepen his depression.

On the ultimate question of defendant's capacity to choose to forgo further appeals, however, Dr. Weiss was equivocal. He testified that defendant is well aware of the nature of his decision and fully understands what is at stake. He indicated, however, that he felt "troubled" by his observations of defendant's depression, and had "some doubts in [his] mind about whether this was the depression talking or whether this was a completely rational

person talking." Dr. Weiss stated: "I would prefer to demur as far as a—an ultimate conclusion as to his capacity because I don't think [Mr. Martini] has been adequately treated yet for me to know how he is at his best." Ultimately, Dr. Weiss admitted that he could not say with reasonable medical certainty that defendant lacks the capacity to waive further appeals.

Defendant's testimony was presented almost entirely through leading questions. In response to his attorney, defendant admitted to intentionally killing the victim, Irving Flax. He agreed that the jury had properly found him guilty, that he had no excuse for his crime, and that he is satisfied with the legal representation he received both at trial and on appeal.

Defendant testified that he understands that he has a right to an appeal and that his death sentence could be vacated if that appeal is successful. He responded affirmatively when asked if he is willing to give up that right. He agreed that his decision to forgo an appeal was voluntary, that he was not influenced by other people, and that the drugs he is taking were not affecting his decision.

When asked why he wants to be put to death, defendant stated, "Jail is a bad place; the food is bad, extortion, stabbings, loud, noisy, dirty, rats and mice, absolution." The defense attorney then asked whether defendant meant religious absolution, to which defendant responded, "Yes, I do, and that I should be punished for what I did ... I want to—I want to, you know, repent for what I did. I'm sorry for what I did. I think that I should be punished." When offered the opportunity to say something to the judge, defendant said, "Listen to me and let [me] have the death penalty."

At the conclusion of the proceedings, the trial court determined that defendant is competent to waive his processing of a post-conviction relief petition and that the public defenders may not proceed with the petition for post-conviction relief. The court further concluded that defendant is not suffering from any metal illness or impairment. It noted that if defendant is suffering from

schizophrenia, the condition has not affected his ability to choose to forgo his post-conviction petition, a choice that the court found rational. Although the court found that defendant is depressed, the court expressed its opinion that anyone would be depressed in defendant's situation and concluded that the condition does not affect defendant's ability to make a rational choice whether to proceed with his appeal. Considering Dr. Weiss's opinion that defendant's medication affects his ability to make a rational decision, the court stated, "I really don't know what [Dr. Weiss] bases that on, but we see the person, we hear the person."

## II

I disagree with the majority's view that the issues presented here are essentially the same as those presented in *Koedatich* I and II and in *Hightower*. Those cases involved presenting mitigating evidence in the penalty phase, permitting defendant to request the death penalty during the trial, and prohibiting a direct appeal of a sentence of death. In all those cases, the reliability of the conviction and the sentence of death had not been tested in direct appeals. In the present case, however, defendant's direct appeals have been exhausted, and he concedes his guilt and proper imposition of the death penalty. I agree that the State's interest in the reliability of the determination of guilt and the sentence of death must be established at trial and on direct appellate review before an execution should be permitted. That does not, however, prevent a competent defendant from waiving his or her personal right to file for post-conviction relief.

I am also persuaded that the majority's reliance on the two cases cited by Judge Fletcher in her lecture, *ante* at 609, 677 *A.*2d 1110, is misplaced. The defendants in those two cases continued to maintain their innocence even after they were convicted. In contrast, Martini admits his guilt and asserts that he is perfectly satisfied with the abled assistance of his attorneys.

## III

*Rule* 3:22 controls our post-conviction relief proceedings. "Any person convicted of a crime *may,* pursuant to this rule, file with the county clerk of the county in which the conviction took place a petition for post-conviction relief. . . ." *R.* 3:22–1 (emphasis added). Based on the language of that rule, post-conviction relief applications are not only personal to a defendant, but also discretionary or elective rather than mandatory. The personal nature of the petition is further reflected by the requirement that the petition be personally verified by the defendant. *R.* 3:22–8. In addition, *Rule* 3:22–2 designates four alternative grounds for relief: (1) substantial denial of a federal or state constitutional right in the post-conviction proceedings; (2) lack of jurisdiction of the court to enter the judgment of conviction; (3) imposition of a sentence not authorized by law or in violation of established procedures; and (4) any ground available heretofore as a basis for collateral attack by *habeas corpus,* statute or common law. Claims that were adjudicated on their merits in a direct appeal may not be relitigated in post-conviction proceedings. *R.* 3:22–5.

Although certain claims are best pursued in a post-conviction relief proceeding, such as ineffective assistance of counsel. or a claim based on a violation of *Brady v. Maryland, supra,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215, defendant has expressly waived his right to pursue such claims. The *Simmons* issue, *ante* at 610–612, 677 *A.*2d at 1110–1111, was raised and decided in *Martini I. Rule* 3:22–5 expressly bars relitigation of the *Simmons* issue in a post-conviction relief proceeding. Defendant has been made aware that his decision to forego a post-conviction relief proceeding will bar him from seeking federal *habeas corpus* based on *Picard v. Connor,* 404 *U.S.* 270, 275, 92 *S.Ct.* 509, 512–13, 30 *L.Ed.*2d 438, 443 (1971).

I agree with the majority that the death penalty should not be carried out until defendant's guilt and the lack of disproportionality have been reliably established. I part company with the majority's conclusion that post-conviction relief proceedings are required before reliability can be sufficiently established. Both

*Martini I* and *Martini II* required exhaustive reviews of both the record and the controlling legal principles before the Court concluded that defendant's guilt and the lack of disproportionality were reliably established. Moreover, Martini admits his guilt, agrees that the aggravating factor applied, and professes his satisfaction with his legal counsel throughout.

It is my belief that once guilt, the application of at least one aggravating factor, and the lack of disproportionality are reliably established, a competent defendant has the right to decide not to prosecute a post-conviction relief application even if it means hastening his or her own death. While a capital defendant has no right to compel the State to execute him or her, he or she has the right not to institute legal proceedings that would delay execution. Martini's decision not to seek post-conviction relief was no doubt influenced by the fact that he has two life terms for murder awaiting him in Arizona. As Justice Broussard of the California Supreme Court so aptly stated, "A man facing the awful alternatives of execution or life imprisonment without possibility of parole could rationally prefer execution, or at least feel that the comparative advantage of life imprisonment was not worth the humiliation and loss of dignity he believes entailed in the presentation of mitigation evidence." *People v. Deere,* 41 *Cal.*3d 353, 369, 222 *Cal.Rptr.* 13, 23–24, 710 *P.*2d 925, 935 (1985) (Broussard, J., concurring). The same is true with respect to presenting a post-conviction relief application.

## IV

Whether Martini can waive his right to pursue post-conviction relief should not be influenced by the pendency of proportionality review in the case involving defendant Joseph Harris. Even if the data submitted in that case persuade this Court to vacate Harris's sentence of death, this Court may not necessarily declare our Death Penalty Act unconstitutional. Martini is aware of the pendency of the *Harris* case and that it could result in declaring the Act unconstitutional. Notwithstanding that information, he

has knowingly and intelligently elected to waive his right to prosecute a post-conviction application. Nonetheless, I would not oppose staying Martini's execution until the *Harris* proportionality review is conducted by this Court in September 1996. Because his waiver decision is revocable, Martini may change his mind after the arguments in the *Harris* case have been presented.

If Martini is executed and the Death Penalty Act is eventually declared unconstitutional, Martini's execution will have been based on his waiver decision. That position would be analogous to that of death-row inmates executed under our previous Death Penalty statute, *N.J.S.A.* 2A:113–4, that was declared unconstitutional in *State v. Funicello,* 60 *N.J.* 60, 65–66, 286 *A.*2d 55, *certif. denied,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972). Unlike Martini, most of those were executed while still protesting their innocence. As was recognized in *State v. Marshall, supra,* 130 *N.J.* at 219, 613 *A.*2d 1059, one or more death-row inmates will die before all legal issues surrounding our present Death Penalty Act have been resolved. A court can only see that justice is rendered at a given time.

Finally, I agree that many of the rules that control post-conviction relief applications should be relaxed for a death-row inmate who has filed his or her own first petition for post-conviction relief.

I would affirm the judgment of the Law Division.

GARIBALDI, J., joins in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices Handler, Pollock, O'Hern and Stein—5.

*For affirmance*—Justices GARIBALDI and COLEMAN—2.