IN RE APPLICATION FOR PETITION FOR WRIT
OF HABEAS CORPUS BY DAN ROSS AS
NEXT FRIEND ON BEHALF
OF MICHAEL B. ROSS
(SC 17342)

IN RE APPLICATION FOR PETITION FOR WRIT
OF HABEAS CORPUS BY THE OFFICE OF
THE CHIEF PUBLIC DEFENDER AS
NEXT FRIEND ON BEHALF OF
MICHAEL B. ROSS
(SC 17343)

Sullivan, C. J., and Norcott, Vertefeuille,
Zarella, Lavery, Foti and Dranginis, Js.

Argued January 21—officially released January 27, 2005*

* January 27, 2005, the date that this decision was released as a slip
opinion, is the operative date for all substantive and procedural purposes.

*Jon L. Schoenhorn,* for the plaintiff in error (petitioner Dan Ross).

*Temmy Ann Pieszak,* chief of habeas corpus services, with whom was *Adele V. Patterson,* assistant public defender, for the plaintiff in error (petitioner office of the chief public defender).

*Harry Weller,* supervisory assistant state's attorney, with whom were *Kevin T. Kane,* state's attorney, and *Michael O'Hare,* supervisory assistant state's attorney, and, on the brief, *Robert J. Scheinblum,* assistant state's attorney, and *Jessica Probolus,* special deputy assistant state's attorney, for defendant in error (respondent commissioner of correction).

*Edward J. Gavin* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Opinion*

ZARELLA, J. This opinion relates to the orders of this court dated January 25, 2005, dismissing the motions to stay the execution of Michael B. Ross[1] filed by the plaintiff in error, Dan Ross, and the plaintiff in error,

---

[1] We hereinafter refer to Michael B. Ross as Michael Ross.

the office of the chief public defender.[2] See *In re Application for Writ of Habeas Corpus by Dan Ross*, 272 Conn. 674, 675, 866 A.2d 541 (2005) (*In re Application II*). The motions were filed in connection with two separate writs of error brought by the plaintiffs in error challenging the orders of the habeas court dismissing their respective petitions for a writ of habeas corpus on behalf of Michael Ross. *In re Application for Writ of Habeas Corpus by Dan Ross*, 272 Conn. 653, 655, 866 A.2d 542 (2005) (*In re Application I*). We affirmed the orders of the habeas court and dismissed the writs of error on the ground that the plaintiffs in error lacked standing to bring the habeas petitions. Id., 667, 673. Accordingly, we dismissed the motions to stay as moot. *In re Application II*, supra, 675. In our opinion dismissing the motions to stay as moot, we indicated that this opinion explaining in greater detail the reasons for the dismissal of the motions would follow. Id.

The underlying facts and procedural history of this case are set forth in our decisions in *In re Application I*, supra, 272 Conn. 653, and *State* v. *Ross*, 272 Conn. 577, 863 A.2d 654 (2005). In summary, these cases involve attempts by the plaintiffs in error to obtain next friend status in the underlying criminal proceeding against Michael Ross in order to pursue postconviction relief on his behalf, including participation in the ongoing consolidated habeas litigation[3] on behalf of several defendants who have been sentenced to death. We have concluded that they have no standing to do so. See *In re Application I*, supra, 272 Conn. 667; *State* v. *Ross*, supra, 611. The plaintiffs in error have argued in their briefs in these proceedings that Michael Ross cannot

---

[2] We hereinafter refer to Dan Ross and the office of the chief public defender collectively as the plaintiffs in error. We hereinafter refer to the office of the chief public defender as the chief public defender.

[3] See, e.g., *State* v. *Ross*, supra, 272 Conn. 582 n.4 (detailing nature of consolidated habeas litigation).

waive his right to pursue further postconviction reme-
dies and, therefore, his execution must be stayed. We
disagree. As we have noted, we have concluded, and
the dissenting justices agree, that the plaintiffs in error
have no standing to bring habeas proceedings on behalf
of Michael Ross and, therefore, the habeas petitions
properly were dismissed. See *In re Application I*, supra,
663, 667. The motions for stay were filed in conjunction
with the writs of error that have been dismissed.
Accordingly, the motions to stay must be dismissed
as moot.

The dissenting justices conclude, however, that: (1)
General Statutes (Rev. to 1987) § 53a-46b[4] creates a
nonwaivable right to reap the benefit of litigation raised
by others claiming that their sentences of death were
the result of "passion, prejudice or any other arbitrary
factor";[5] and (2) this court has an independent institu-
tional duty to exercise its supervisory powers to prevent
the execution of a death sentence that may be the prod-
uct of an arbitrary factor. We disagree. It simply is
unprecedented for this court to conclude that, although
it has no jurisdiction over the case before it, it may act

---

[4] General Statutes (Rev. to 1987) § 53a-46b provides in relevant part: "(a)
Any sentence of death imposed in accordance with the provisions of section
53a-46a shall be reviewed by the supreme court pursuant to its rules. In
addition to its authority to correct errors at trial, the supreme court shall
either affirm the sentence of death or vacate said sentence and remand for
imposition of a sentence in accordance with subdivision (1) of section
53a-35a.

"(b) The supreme court shall affirm the sentence of death unless it deter-
mines that: (1) The sentence was the product of passion, prejudice or any
other arbitrary factor . . . .

"(c) The sentence review shall be in addition to direct appeal and if taken,
the review and appeal shall be consolidated for consideration. The court
shall then render its decision on the legal errors claimed and the validity
of the sentence."

All further references in this opinion to § 53a-46b are to the 1987 revision
unless otherwise specified.

[5] We note that the dissenting justices makes no argument that the waiver
of postconviction relief is constitutionally prohibited.

in that case to enter a stay in a separate proceeding. Moreover, the dissenting justices misconstrue § 53a-46b as providing for mandatory review of postconviction proceedings in death penalty cases. That statute provides only for mandatory sentence review, which already has taken place in the criminal proceeding against Michael Ross and has resulted in the affirmance of his death sentences. See generally *State* v. *Ross*, 269 Conn. 213, 849 A.2d 648 (2004). In addition, the dissenting justices' conclusions are inconsistent with our cases indicating that participation in the consolidated litigation is voluntary; see, e.g., *State* v. *Colon*, 272 Conn. 106, 377–79, 864 A.2d 666 (2004); *State* v. *Reynolds*, 264 Conn. 1, 226–34, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Breton*, 264 Conn. 327, 405, 824 A.2d 778, cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 798 (2003); *State* v. *Cobb*, 251 Conn. 285, 499, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000) (*Cobb II*); *State* v. *Cobb*, 234 Conn. 735, 761–63, 663 A.2d 948 (1995) (*Cobb I*); and with the well established principle that, even in death penalty cases, constitutional claims and claims raising the specter that the death sentence was the result of an arbitrary factor are waivable. See, e.g., *State* v. *Colon*, supra, 154 n.26.

Whether § 53a-46b (b) creates a nonwaivable right to reap the benefit of litigation brought by others claiming that their sentences of death were the result of "passion, prejudice or any other arbitrary factor" is a question of law over which our review is plenary. See, e.g., *State* v. *Ross*, supra, 272 Conn. 598.

To provide context for our discussion of the statute, we begin our analysis with a history of the consolidated habeas litigation. The issue of racial disparity in the administration of the death penalty statute in Connecticut was first raised in *Cobb I*, supra, 234 Conn. 735.

The defendant in that case, Sedrick Cobb, "had moved for enlargement of the class of similar cases that [this court would] consider in determining whether his death sentence [was] justified in light of the prohibition against disproportionality provided by . . . § 53a-46b (b) (3)." Id., 737. Specifically, Cobb requested that we consider "all cases prosecuted in Connecticut after October 1, 1973, in which a capital felony *could have been charged* pursuant to . . . § 53a-46b and which resulted in a homicide conviction, following a plea or trial." (Emphasis in original; internal quotation marks omitted.) Id., 738. Cobb argued that this expanded universe of cases was "necessary to enable this court to evaluate his claim that race has an impermissible effect on capital sentencing decisions in Connecticut . . . ." Id. We rejected Cobb's claim, concluding that "the legislature did not intend proportionality review to encompass a comparison [of] all homicide cases prosecuted since 1973 in which a capital felony could have been charged." Id., 747.

We also concluded, however, that Cobb could have raised his racial disparity claim under § 53a-46b (b) (1). Id., 761. Under § 53a-46b (b) (1), however, "it would have been necessary for [Cobb] to have made his statistical record in the trial court, and to have subjected it to a full evidentiary hearing, as in [*McCleskey* v. *Zant*, 580 F. Sup. 338 (N.D. Ga. 1984), aff'd sub nom. *McCleskey* v. *Kemp*, 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)], before presenting it on appeal. To hold that [Cobb] could raise this claim on appeal under § 53a-46b (b) (1), without having first created an adequate factual basis in the trial court, would be incorrect for many of the same reasons that we reject [Cobb's] claim under § 53a-46b (b) (3), because it would assume, without any clear indication, that the legislature intended this court to engage in the same extraordinary process of data gathering and fact-finding. Thus, both

subdivision (1) and subdivision (3) of § 53a-46b (b) ordinarily contemplate not data gathering and fact-finding by or under the aegis of this court from disputed evidence, which [Cobb's] claim would require, but evaluation by this court of the trial court record of the case on appeal, and with respect to subdivision (3), of the trial court records of similar cases." *Cobb I*, supra, 234 Conn. 762.

We also concluded in *Cobb I* that, "even though [Cobb] has not created a trial record . . . that would permit him to present, in his direct appeal, his statistical claim under § 53a-46b (b) (1) . . . he should be permitted to do so by way of a postappeal habeas corpus petition . . . . Although ordinarily habeas corpus cannot serve as a surrogate for a claim that could have been presented on direct appeal . . . we conclude that, with respect to the claim that [Cobb] seeks to present by this motion, he should not be bound by that principle because the scope and meaning of § 53a-46b (b) have remained uncertain and, until [1995], have been the subject of only one published decision of this court . . . . Furthermore, the nature of [Cobb's] claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim." (Citations omitted.) Id., 762–63.

"In *Cobb II* [supra, 251 Conn. 285], we reaffirmed our holding in *Cobb I* that a racial disparity claim 'was cognizable under § 53a-46b (b) (1), but must [be] based on a full evidentiary hearing made at trial in the trial court.' [Id.], 499. Because [Cobb] had not made such a record [in] the trial court, he was required to proceed by way of a habeas petition. Id. In support of this conclusion, we noted 'two further aspects of [his] claim. First . . . this claim was brought in *Cobb I* by motion of [Cobb's] separate proportionality counsel *"because [Cobb's] other appellate counsel [did] not intend to*

*raise such a claim under § 53a-46b (b) (1)."* . . . *Cobb I,* supra, 234 Conn. 740. Needless to say, that "other appellate counsel" is the same counsel who now brings this claim, nearly four years later. Second, this appeal was filed in October, 1991. [Cobb's] brief was not filed in this court until February, 1997, more than six years later. Under these circumstances, it ill behooves [Cobb's] counsel to request a remand for an evidentiary hearing (1) on a claim that he represented nearly four years earlier he did not intend to bring, and (2) in an appeal the disposition of which has been delayed for nearly eight years largely because of his delay in filing his brief. We see no valid reason to delay the disposition of this appeal further. The state, the victim's family and [Cobb] are entitled to a disposition of this appeal now.' . . . *Cobb II,* supra, 499–500 n.105." (Emphasis in original.) *State* v. *Breton,* supra, 264 Conn. 400–401.

In *State* v. *Reynolds,* supra, 264 Conn. 1, we considered whether the defendant, Richard Reynolds, was entitled to a hearing before the trial court on his claim that the death penalty is imposed in a racially discriminatory and arbitrary manner in this state. See id., 226. After the jury returned its verdict imposing the death penalty, Reynolds requested such a hearing and indicated that "he was not prepared to proceed immediately with the requested hearing and that he needed 'several months' to do 'detailed research into court records and other similar preparation' before the hearing. . . . [He] also requested that his sentencing be postponed until after a hearing and decision on his motion for the imposition of a life sentence." Id., 229. We agreed that Reynolds "was entitled to an evidentiary hearing for the purpose of presenting facts in support of his claim that . . . he should be sentenced to life imprisonment without out the possibility of release because of the allegedly flawed manner in which this state's death penalty statute is implemented." Id., 230. We concluded, however,

that Reynolds "was not entitled to an indefinite period of time within which to attempt to develop facts in support of his claim." Id., 231. Accordingly, we concluded "that the proper course [was] not to remand [Reynolds'] claim to the trial court but, rather, to afford [Reynolds] an opportunity to renew his claim by way of a habeas corpus petition." Id., 232. We recognized that, since our decisions in *Cobb I* and *Cobb II*, a habeas proceeding had been instituted in the *Cobb* matter and that Chief Justice William J. Sullivan had appointed former Chief Justice Robert Callahan to serve as a special master to oversee the proceeding. Id., 233. We concluded that, in the interest of judicial economy and fairness to the parties, capital defendants should no longer raise claims of racial bias before the trial court; instead, all such claims should be presented in the consolidated habeas proceeding. Id., 234. We noted that, under ordinary circumstances, a capital defendant's failure to raise the claim in a timely manner might constitute a procedural bar to habeas proceedings, but cited our statement in *Cobb I*, supra, 234 Conn. 763, that the circumstances of the case counseled against raising such a bar. *State* v. *Reynolds*, supra, 232 n.204. Finally, we noted that the issue of "whether any particular defendant or the state would be barred from litigating a claim of this nature in the consolidated habeas proceeding that we contemplate when that defendant desires to present a different variation of the claim or when the state has a different variation of its response to the defendant's claim" would be left to the discretion of former Chief Justice Callahan and the habeas judge. Id., 234 n.207; see also *State* v. *Breton*, supra, 264 Conn. 405 (in light of untimeliness of defendant's racial disparity claim, if defendant intended to pursue claim he was required to raise it in habeas proceeding).

With this background in mind, we now turn to the issue of whether § 53a-46b renders participation in the

consolidated habeas proceeding mandatory and non-waivable. General Statutes (Rev. to 1987) § 53a-46b provides in relevant part: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the supreme court pursuant to its rules. . . .

"(b) The supreme court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor . . . ."

We agree with the dissenting justices that these provisions constitute a mandatory directive to this court to review sentences of death. We further conclude that the obligation of this court to review death sentences cannot be discharged by virtue of a defendant's expressed desire to forgo review. Accordingly, we conclude that, in every *case* in which a sentence of death is imposed, this court is required, without exception, to conduct a sentence review.

We do not believe, however, that § 53a-46b creates a nonwaivable right to a review of any and all *claims* implicating the arbitrariness of a death sentence, regardless of when, how and by whom the claim is raised. It is well established that, even in capital cases, the defendant waives claims—including those of constitutional magnitude and those implicating the arbitrariness of the sentence—if the claim is not raised at trial and the record is inadequate for review by this court.[6]

---

[6] We find Justice Norcott's reliance on the existence of statutes from other states limiting sentence review to proceedings "on the record" in support of the proposition that this court is required to consider matters outside the record to be misplaced. Nothing in § 53a-46b suggests that this court may reverse a death sentence on the basis of a claim that is not supported by the record. Rather, our cases clearly establish that, if a claim was not made before the trial court and there is no record for review, the claim is waived. Such a claim *may* be brought in a habeas proceeding, but the habeas court may conclude that the claim is procedurally barred, thus precluding any further review by this court. Nor does § 53a-46b or our cases suggest that, if the habeas court does not dismiss the claim, there is mandatory,

See *State* v. *Colon,* supra, 272 Conn. 154 n.26 ("even in capital cases, we have held that, [a]lthough the defendant's brief adverts to independent rights under the [state] constitution, [when] no such arguments have been briefed . . . they are . . . deemed to have been waived" [internal quotation marks omitted]), quoting *State* v. *Ross,* 230 Conn. 183, 208, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); see also *State* v. *Rizzo,* 266 Conn. 171, 290 n.69, 833 A.2d 363 (2003); *State* v. *Webb,* 238 Conn. 389, 423 n.32, 680 A.2d 147 (1996); cf. *State* v. *Reynolds,* supra, 264 Conn. 206–207 (when defense counsel made tactical decision to refrain from objecting to state's attorney's improper conduct, defendant could not raise claim on appeal).

Moreover, our cases discussing the proper procedure for bringing a racial disparity claim do not suggest that a defendant in a death penalty case cannot waive a claim of racial disparity. Rather, they indicate the opposite. We criticized the defendants in *Breton* and *Reynolds* for their attempts to delay the completion of the proceedings by bringing their claims at the eleventh hour and clearly indicated that that was the reason that the claims had to be presented in a habeas proceeding. See *State* v. *Breton,* supra, 264 Conn. 405; *State* v. *Reynolds,* supra, 264 Conn. 231. In other words, we concluded that mandatory review of the claims by this court had been waived. Moreover, although we stated in *Cobb I* and *Reynolds,* apparently in the exercise of our supervisory power, that "the nature of the defendant's claim of systemic racial bias, and the seriousness and finality of the death penalty, counsel against raising any undue procedural barriers to review of such a claim"; *Cobb I,* supra, 234 Conn. 763; accord *State* v. *Reynolds,* supra, 264 Conn. 232 n.204; we never suggested that

nonwaivable review by this court if the court ultimately rules against the defendant.

§ 53a-46b mandated the bringing of a habeas action or barred the habeas court from dismissing such an action on procedural grounds. Indeed, we clearly have suggested otherwise. See *State* v. *Colon*, supra, 272 Conn. 379 (defendant must bring racial disparity claim in habeas action *if he intends to bring one*); *State* v. *Breton*, supra, 264 Conn. 407 (same); see also *State* v. *Reynolds*, supra, 234 n.207 (similar claims "of this nature" may be barred). If § 53a-46b does not require a defendant to bring a habeas action to litigate a racial disparity claim, it does not require him to participate in such an action brought by others.

We further note that the case cited by Justice Norcott in support of his argument that there is a distinction between mandatory sentence review and appellate review supports the view that claims may be waived in mandatory review proceedings. In *State* v. *Dodd*, 120 Wash. 2d 1, 838 P.2d 86 (1992), the Washington Supreme Court construed a death sentence review statute that, like ours, distinguished between appellate review and death sentence review, and concluded that the sentence review could not be waived. Id., 20. The defendant in that case, Westley Allan Dodd, had "chose[n] not to present mitigating evidence and so instructed his attorneys." Id., 9. The Washington sentence review statute required the court to determine "[w]hether sufficient evidence justifies the finding that 'there are not sufficient mitigating circumstances to merit leniency' . . . ." Id., 24. The court concluded that the jury's determination that sufficient mitigating circumstances did not exist to merit leniency was supported by the record. Id., 25. The court did not suggest that, because its review of the mitigating evidence was mandatory, the presentation of a case in mitigation could not be waived.[7] See

---

[7] We note that, in conducting its sentence review, the court in *Dodd* considered the mitigating nature of the evidence that had been presented. *State* v. *Dodd*, supra, 120 Wash. 2d 25. Similarly, in Michael Ross' case, this court conducted its mandatory review of his sentence on the basis of the record before it. See generally *State* v. *Ross*, supra, 269 Conn. 213. The fact

id.; see also *Pike* v. *State*, Docket No. E2002-00766-CCA-R3-PD, 2004 Tenn. Crim. App. LEXIS 635, \*38–\*41 (July 15, 2004) (defendant in death penalty case may waive right to present mitigating evidence even though statute provides for mandatory sentence review), appeal granted, Docket No. E2002-00766-SC-R11-PD, 2004 Tenn. LEXIS 1034 (November 22, 2004).

In support of their argument that claims that would be subject to mandatory sentence review if raised cannot be waived, the dissenting justices place heavy reliance on the decision of the New Jersey Supreme Court in *State* v. *Martini*, 144 N.J. 603, 677 A.2d 1106 (1996), cert. denied, 519 U.S. 1063, 117 S. Ct. 699, 136 L. Ed. 2d 621 (1997). The court in that case concluded that a defendant in a death penalty case could not waive postconviction relief proceedings for certain claims. See id., 613–14. The court recognized, however, that other jurisdictions have not adopted such a rule. Id.; see also *Pike* v. *State*, supra, 2004 Tenn. Crim. App. LEXIS \*43 ("no jurisdiction other than . . . New Jersey . . . has adopted a bright-line rule mandating post-conviction review in every capital case, even when the challenge is over the objection of the death-sentenced inmate"). In light of our clear precedent to the contrary, we see no reason to join the New Jersey court in its isolation.

On the basis of the foregoing analysis, we conclude that § 53a-46b (b) does not create a nonwaivable right to mandatory sentence review by this court of any and all claims that the death sentence was "the product of passion, prejudice or any other arbitrary factor," regardless of the time and manner in which the claim was raised.[8] In other words, the statute does not require

---

that Michael Ross chose not to present evidence of systemic racial bias does not somehow render that review defective.

[8] Although we recognize that the dissenting justices go to some lengths to limit their argument that claims that the death penalty was the product of an arbitrary factor are nonwaivable to claims that the administration of

this court to impose a moratorium on the execution of death sentences whenever an unproven claim of systemic arbitrariness in the administration of the death penalty scheme is raised.[9] Nor do we believe that we should do so in the exercise of our supervisory powers.

Over the course of almost twenty years of litigation, Michael Ross never has raised the claim that his death

the death penalty is infected by racial bias, we do not believe there is any principled line to be drawn between such claims and other claims of arbitrariness. We cannot conclude, for example, that a sentence that is the product of racial animus or racial favoritism is inherently more arbitrary than a sentence that is the product of prosecutorial misconduct. Cf. *McCleskey* v. *Kemp*, supra, 481 U.S. 315–17 (eighth amendment claim that sentence impermissibly rests on irrelevant factor of race easily could be extended to apply to claims based on other minority groups, gender, race or gender of defense attorneys or judges, defendant's facial characteristics or physical attractiveness of defendant or victim). Accordingly, adoption of the reasoning of the dissenting justices would render nonwaivable virtually *any* claim that a death sentence is "the product of passion, prejudice or any other arbitrary factor"; General Statutes (Rev. to 1987) § 53a-46b (b); regardless of when or how it was raised. This would be entirely inconsistent with our precedent and would render our death penalty scheme unworkable.

We further note that the dissent of Justice Norcott states that, "[i]f the defendants who have chosen to participate in the consolidated habeas corpus proceedings are successful, it will be because they will have proven that the administration of the facially nondiscriminatory death penalty statutes violates the equal protection rights guaranteed to all defendants by our state constitution . . . ." The specific claims being raised in the habeas proceeding are not before us in this case, however. We note that § 53a-46b was intended to implement the eighth amendment requirement of a reliable and nonarbitrary death sentence. See *State* v. *Webb*, supra, 238 Conn. 494–505. The participants in the consolidated habeas proceeding could prevail by showing that racial bias creates arbitrariness in violation of the eighth amendment without establishing any equal protection violation. Thus, the racial bias claim does not necessarily implicate constitutional protections that are not implicated by other claims of arbitrariness.

[9] We express no opinion as to the merits of the consolidated habeas litigation. We note only that, as of yet, systemic racial bias has not been demonstrated. We further note that, even if it ultimately is determined that systemic racial bias exists, that will not necessarily mean that the death sentences of the participants in the litigation will be reversed. See *McCleskey* v. *Kemp*, supra, 481 U.S. 292–97 (statistical evidence relating to imposition of death sentence does not constitute proof that discrimination existed in any particular defendant's case).

sentences for the brutal murders of four young women were the product of systemic racial bias. Indeed, he has expressly stated on the record during a competency hearing in the underlying criminal proceedings that he "[does] not wish to be a part of [the consolidated litigation] . . . ." We have no reason to think that he or his counsel, in fact, believes that his sentence was the product of such bias. We have concluded that § 53a-46b did not bar him from waiving this claim at trial, thereby waiving mandatory sentence review of the issue by this court. Similarly, § 53a-46b does not require him to raise this claim in a habeas proceeding or to share in the legal effect of a proceeding brought by others.[10] Accordingly, we conclude that § 53a-46b does not require this court to stay Michael Ross' execution until the completion of the consolidated habeas litigation. We disagree, therefore, with the conclusion of the dissenting justices that the motions to stay filed by the plaintiffs in error should be granted.

In this opinion SULLIVAN, C. J., and VERTEFEUILLE and FOTI, Js., concurred.

NORCOTT, J., dissenting from the order. I previously have expressed my reservations about executing the defendant, Michael B. Ross, prior to the completion of the study about alleged racial discrimination in the administration of Connecticut's death penalty presently underway in the context of the consolidated habeas corpus proceedings in certain other capital cases. See *State* v. *Ross*, 272 Conn. 577, 614, 863 A.2d 654 (2005) (*Norcott, J.*, concurring). In that case, I nevertheless

---

[10] As we noted in *State* v. *Ross*, supra, 272 Conn. 577, Michael Ross "has not 'waived' his right to further legal proceedings in the sense that he has forfeited the ability to exercise that right in the future. The parties [in the underlying criminal case] are in agreement that [Michael Ross] may exercise his right to file a petition for a writ of habeas corpus at any time and that, if he does so, the execution will be stayed." Id., 580 n.2.

concurred in the judgment of this court dismissing the writ of error brought by the plaintiff in error, the office of the chief public defender of the state of Connecticut (public defender), concluding that this issue, although significant and worrisome, was not properly before us. Id., 616. Moreover, in accordance with that position, I previously have voted to deny the motions of third parties, including the public defender, to stay the execution of the defendant. I maintain my agreement with this court's decisions denying next friend standing to third parties, such as the public defender and the plaintiff in error, Dan Ross, and I agree with the majority's opinion in that respect. Upon due reflection, however, I now conclude that both General Statutes § 53a-46b[1] and our inherent supervisory powers over the administration of justice in this state require this court to act, sua sponte, to stay the execution of the defendant, pending resolution of the racial discrimination claims in the consolidated habeas corpus proceedings administered by the special master, former Chief Justice Robert Callahan. Accordingly, I respectfully dissent from this court's order dismissing the motions to stay the execution of the defendant.

I initially wrote separately from this court's otherwise well reasoned majority opinion dismissing the first writ

---

[1] General Statutes § 53a-46b provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the Supreme Court pursuant to its rules. In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The Supreme Court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; or (2) the evidence fails to support the finding of an aggravating factor specified in subsection (i) of section 53a-46a.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

of error because of my concerns about the "legitimate claims, still unresolved, that our death penalty system is administered in a racially discriminatory, arbitrary or capricious manner."[2] Id., 614 (*Norcott, J.,* concurring), citing *State* v. *Cobb,* 234 Conn. 735, 738, 738–39 n.4, 663 A.2d 948 (1995) (discussing preliminary data). These claims, first addressed by this court in *Cobb*[3] have led

[2] I previously have noted the "pervasive and insidious influence of race and poverty in the administration of the death penalty." *State* v. *Breton,* 264 Conn. 327, 447, 824 A.2d 778 (*Norcott, J.,* dissenting), cert. denied, 540 U.S. 1055, 124 S. Ct. 819, 157 L. Ed. 2d 708 (2003); see also *State* v. *Cobb,* 251 Conn. 285, 545–46, 743 A.2d 1 (1999) (*Norcott, J.,* dissenting) ("I am convinced that the arbitrariness inherent in the sentencer's discretion is intensified by the issue of race. Indications from the available evidence suggest that the death penalty has been imposed in a racially discriminatory manner and has been geared toward minorities and the poor."), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Webb,* 238 Conn. 389, 566–67, 680 A.2d 147 (1996) (*Norcott, J.,* dissenting) ("I am persuaded that our statutory scheme for [the] imposition [of the death penalty] cannot withstand constitutional scrutiny because that scheme, by its very nature, admits of an unacceptable opportunity for arbitrariness and the influence of racial discrimination to operate in the determination of who shall die at the hands of the state").

[3] "In *State* v. *Cobb,* supra, 234 Conn. 738–39 n.4, which was decided in 1995, the defendant produced preliminary data [supporting his contention] that race has an impermissible effect on capital sentencing because: '(1) since 1973, prosecutors have charged a capital felony pursuant to General Statutes § 53a-54b in seventy-four cases, of which only eleven, or 15 percent, have involved the murder of a victim who was black, even though 40 percent of all murder victims in the state during that same time period were black; (2) since 1973, although there have been eighteen capital prosecutions for murder committed during the course of kidnapping, none was prosecuted where the victim was black; (3) during the same period, there have been twelve capital prosecutions for murder committed in the course of a sexual assault, and only one involved the murder of a black victim; (4) since 1973, twenty-eight cases have resulted in a conviction of capital felony, by verdict or plea, and eighteen of those twenty-eight have proceeded to a hearing on the imposition of the death penalty. Of the twenty-eight capital felony convictions, only four, or 14 percent, have involved the murder of a victim who was black, and of the eighteen that have gone to a penalty phase hearing, only one, or 5.5 percent, has involved the murder of a black victim; (5) of the sixty-six capital convictions in which the guilt phase has been concluded, twenty-one involved black defendants and forty-five involved nonblack defendants. Of the black defendants, thirteen of twenty-one, or 62 percent, were convicted of capital felonies and fifteen of forty-five, or 33 percent, nonwhite defendants were so convicted.' He sought 'the opportunity to demonstrate the number of kidnap murders of black victims and the

to the initiation of a comprehensive statistical study about the influence of race and other factors in the application of Connecticut's death penalty. That study presently is ongoing in the context of the aforementioned consolidated habeas corpus litigation that is being supervised by former Chief Justice Callahan. See *State* v. *Reynolds*, 264 Conn. 1, 232–33, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). In my concurrence, I wrote of my concern that "to permit an execution to proceed without the benefit of the completion of that study and a ruling thereon amounts to an informal and premature judicial imprimatur on the fairness of the death penalty

number of sexual assault murders of black victims that were not prosecuted as capital felonies and to demonstrate the disproportionate treatment of those crimes as compared to the treatment of comparable crimes involving white victims.' Id.

"Because of the need for the creation of an adequate factual record as to alleged discrimination, this court concluded that the defendant's claim in *Cobb* was more appropriately raised collaterally via a habeas corpus proceeding, rather than a remand from direct appeal. Id., 741. Data collection and analysis by the public defenders commenced shortly thereafter, and in *State* v. *Reynolds*, [264 Conn. 1, 233, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004)], this court ordered that the *Cobb* and *Reynolds* racial discrimination claims 'be litigated before the same habeas judge and in the same general, consolidated hearing, on behalf of all defendants who have been sentenced to death.' In December, 2002, Chief Justice William J. Sullivan appointed former Chief Justice Robert Callahan as special master to manage the litigation, including the preparation and submission of the state's response. Id." *State* v. *Ross*, supra, 272 Conn. 615–16 n.3 (*Norcott, J.*, concurring).

Moreover, in *State* v. *Reynolds*, supra, 264 Conn. 1, the court also clarified the procedure by which capital defendants may raise these racial discrimination claims. The court concluded that "it is not appropriate for capital defendants to make such a claim in the trial court before which their penalty phase hearings will be or have been held. Such a claim properly is presented in the consolidated habeas proceeding to which we have referred, so that it may be litigated and resolved at the trial level in one proceeding, rather than several." Id., 233–34. This court "disavow[ed]" any indication, previously expressed in *State* v. *Cobb*, supra, 234 Conn. 763 and n.21, that a "capital defendant should present this claim in the trial court before which his penalty phase hearing will be or has been held . . . ." *State* v. *Reynolds*, supra, 234.

process. Moreover, should the habeas court subsequently conclude that our entire death penalty system is fundamentally flawed as discriminatory on the basis of race *after* the defendant has been executed, our citizens' confidence in this court and the rest of the judicial branch as a bastion of civil rights might suffer irreparable harm." (Emphasis in original.) *State* v. *Ross*, supra, 272 Conn. 615–16 (*Norcott, J.*, concurring). In the first writ of error, however, I put my reservations aside and concurred in the judgment because I concluded that this issue was not properly before the court, as the court properly concluded that the trial court had determined correctly that the defendant was competent to waive further appeals or postconviction remedies, and that the public defender had offered no "meaningful evidence" to the contrary. Id., 609.

In an ordinary criminal matter, this court's decision upholding the trial court's determination as to the defendant's competency would provide the defendant with a path to the ultimate disposition of his case unimpeded by the desires of third parties, including the public defender and the defendant's father, Dan Ross. This case, however, implicates the death penalty, and is, therefore, emphatically not an ordinary criminal case; it is beyond cavil that "[d]eath is different." *State* v. *Rizzo*, 266 Conn. 171, 226, 833 A.2d 363 (2003).[4] Indeed,

---

[4] In *State* v. *Rizzo*, supra, 266 Conn. 226, this court recognized that the " 'penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.' *Furman* v. *Georgia*, 408 U.S. 238, 306, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring). '[T]he imposition of death by public authority is . . . profoundly different from all other penalties . . . .' *Lockett* v. *Ohio*, 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). '[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.' *Woodson* v. *North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)."

we have constitutional and statutory responsibilities, unique to the context of a death sentence, that impose upon us a heightened standard of vigilance as we administer and supervise the proceedings in the present case. In my view, § 53a-46b; see footnote 1 of this dissenting opinion; *requires* us to use our supervisory powers over the administration of justice to stay the execution of this defendant until the claims of racial discrimination in the death sentencing process are finally adjudicated in the consolidated habeas corpus proceedings. That no third party has standing to ask us to take this action in contravention of the wishes of both the defendant and the state is of no moment. To do otherwise would amount to an abdication of our institutional responsibilities under this state's statutory scheme, because our mandatory review of all death sentences imposed in this state, including that in the present case, is necessarily incomplete until those claims of racial discrimination are resolved by this court. Indeed, "under our form of government it is not the inmate on death row . . . who determines when and whether the [s]tate shall execute a prisoner; rather, the law itself makes that determination. The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants." *State* v. *Martini*, 144 N.J. 603, 605, 677 A.2d 1106 (1996), cert. denied, 519 U.S. 1063, 117 S. Ct. 699, 136 L. Ed. 2d 621 (1997).

I

THIS COURT AND MANDATORY SENTENCE
REVIEW UNDER § 53a-46b

I begin my analysis by examining our statutory obligations under § 53a-46b, and the extent to which the statute requires us to stay the execution of the defendant awaiting resolution of the pending racial discrimination claims. Under § 53a-46b (a), this court is required to "review" and determine the "validity" of "[a]ny sentence

of death imposed in accordance with the provisions of section 53a-46a . . . ." In reviewing death sentences, we "shall affirm the sentence of death unless [we determine] that: (1) *The sentence was the product of passion, prejudice or any other arbitrary factor;* or (2) the evidence fails to support the finding of an aggravating factor specified in subsection (i) of section 53a-46a." (Emphasis added.) General Statutes § 53a-46b (b). Determination of the scope of this court's obligations under § 53a-46b presents an issue of statutory construction wherein "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *State* v. *Kirk R.*, 271 Conn. 499, 510, 857 A.2d 908 (2004); see Public Acts 2003, No. 03-154, § 1.

I begin, as usual, with the language of § 53a-46b, which provides: "(a) Any sentence of death imposed in accordance with the provisions of section 53a-46a shall be reviewed by the Supreme Court pursuant to its rules. In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate said sentence and remand for imposition of a sentence in accordance with subdivision (1) of section 53a-35a.

"(b) The Supreme Court shall affirm the sentence of death unless it determines that: (1) The sentence was the product of passion, prejudice or any other arbitrary factor; or (2) the evidence fails to support the finding of an aggravating factor specified in subsection (i) of section 53a-46a.

"(c) The sentence review shall be in addition to direct appeal and, if an appeal is taken, the review and appeal shall be consolidated for consideration. The court shall then render its decision on the legal errors claimed and the validity of the sentence."

The plain language of § 53a-46b requires this court to review every sentence of death, although it leaves the process by which we undertake that review to our "rules," which generally involve the relevant provisions of the Practice Book. See, e.g., Practice Book § 67-6 (a) (requiring briefs of parties in death penalty appeals to "include a discussion of the issues set forth in General Statutes § 53a-46b [b]"); see also Practice Book § 61-15 (providing for certain automatic stays of execution in death penalty cases).[5] The language, especially subsection (c) of § 53a-46b, providing that "[t]he sentence review shall be in addition to direct appeal . . . if an appeal is taken," also makes clear that our obligation to review death sentences exists separate and apart from any appeal that a defendant might take. Indeed, subsection (a) of § 53a-46b lends further support to the proposition that the court's independent obligation to review death sentences exists "[i]n addition to its authority to correct errors at trial . . . ." The consolidation of the direct appeal and sentence for review

---

[5] Practice Book § 61-15 provides in relevant part: "If the defendant is sentenced to death, the sentence shall be stayed for the period within which to take an appeal. If the defendant has taken an appeal to the supreme or appellate court of this state or to the United States supreme court or brought a writ of error, writ of certiorari, writ of habeas corpus, application for a pardon or petition for a new trial, the taking of the appeal, the making of the application for a writ of certiorari or for a pardon, or the return into court of the writ of error, writ of habeas corpus, or petition for a new trial shall, unless, upon application by the state's attorney and after hearing, the supreme court otherwise orders, stay the execution of the death penalty until the clerk of the court where the trial was had has received notification of the termination of any such proceeding by decision or otherwise, and for thirty days thereafter. Upon application by the defendant, the supreme court may grant a stay of execution to prepare a writ of error, a writ of certiorari, writ of habeas corpus, application for a pardon or petition for a new trial. Upon application by the defendant and after hearing, the supreme court may extend a stay of execution beyond the time limits stated within this rule for good cause shown. No appellate procedure shall be deemed to have terminated until the end of the period allowed by law for the filing of a motion for reconsideration, or, if such motion is filed, until the proceedings consequent thereon are finally determined. . . ."

under subsection (c) of § 53a-46b, "if an appeal is taken," represents a legislative nod to judicial economy, and the reality that most capital defendants take extensive appeals of their convictions and sentences.

Section 53a-46b clearly indicates that the legislature envisioned death sentence review and direct appeal as two different legal entities, although both are creatures of statute. See, e.g., *State* v. *Perkins*, 271 Conn. 218, 234, 856 A.2d 917 (2004) ("[i]t is well settled that a criminal defendant does not have a constitutional right to an appeal; rather, that right exists solely by statute"). Death sentence review, however, is fundamentally different from direct appeal, as well as postconviction collateral attack via habeas corpus proceedings, because death sentence review is not solely an *option* available to a defendant, but a separate mandatory obligation for this court in all capital cases. The mandatory language of § 53a-46b, specifically, the frequent use of the word "shall," in conjunction with the word "any," suggests that our role in the state's capital sentencing scheme is both unwaivable and separate and apart from any appeal that may be taken by a defendant. Although "[d]efinitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature"; (internal quotation marks omitted) *State* v. *Pare*, 253 Conn. 611, 623, 755 A.2d 180 (2000); it is well settled that "the word 'shall' is not dispositive on the issue of whether a statute is mandatory . . . [and] 'the use of the word shall, though significant, does not invariably [create] a mandatory duty.' " *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 22, 848 A.2d 418 (2004). "The test to be applied 'in determining whether a [rule] is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory

provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words.' " *State* v. *Pare*, supra, 622–23; see also id., 625 (relying on "language, purpose and history of [Practice Book] § 42-31 . . . [to] conclude that the term 'shall,' as used in that rule of practice, constitutes a mandatory term . . . [and that] a trial court is required to conduct an individual poll of the jury pursuant to a timely request by either party").

The word "shall" as used in § 53a-46b is mandatory, rather than directory, because the statute imposes a substantive obligation on this court to review all death sentences. Section 53a-46b was enacted in 1980 as No. 80-332, § 2, of the 1980 Public Acts, and the legislature provided for mandatory review by this court in order to add an extra measure of reliability to this state's capital sentencing scheme, as well as to comport with contemporaneous United States Supreme Court decisions endorsing automatic state supreme court review as a means to that end.[6] See 23 S. Proc., Pt. 9, 1980 Sess., p. 2900, remarks of Senator Alfred Santaniello (Stating that the statute "establishes a review by the Supreme Court on all death penalties imposed. It would be an automatic review . . . ."); 23 H.R. Proc., Pt. 9, 1980 Sess., p. 2768, remarks of Representative Richard Tulisano (Stating that the statute "mandates that there be an automatic review by the Connecticut Supreme Court in order to affirm any death sentence which may be imposed on anybody. Most of those standards we feel would put the existing statutes within compliance

---

[6] See *Jurek* v. *Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 250, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Gregg* v. *Georgia*, 428 U.S. 153, 198, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

with the United States Constitutional standards.");[7] see also *State* v. *Webb*, 238 Conn. 389, 504–505, 680 A.2d 147 (1996) (discussing history and enactment of § 53a-46b, and particularly its former provision of proportionality review). It is apparent from this legislative history that mandatory review of all death sentences by this court is not merely directory, but is a key substantive safeguard in this state's capital sentencing scheme.

I note that my conclusion that we have an affirmative obligation to review all death sentences imposed in Connecticut, regardless of the defendant's wishes, is consistent with the holdings of sister state courts construing similar statutes. For example, the Virginia Supreme Court has held that the purpose of mandatory sentence review "is to assure the fair and proper application of the death penalty statutes in this [c]ommonwealth and to instill public confidence in the administration of justice." *Akers* v. *Commonwealth*, 260 Va. 358, 364, 535 S.E.2d 674 (2000); see also *State* v. *Clark*, 128 N.M. 119, 146, 990 P.2d 793 (1999) ("following

---

[7] I also note that, in 1995, when the legislature amended § 53a-46b; Public Acts 1995, No. 95-16, § 3; to eliminate the requirement of proportionality review, Senator John Kissel spoke in favor of that amendment. He responded to concerns about eliminating that safeguard by stating: "I would just like to assure them that . . . upon a sentence of death when the—the Supreme Court will still conduct a review, it will still have completely within its authority its ability to correct errors that it believed occurred at the trial level and also it will be able to overturn such a decision if there's a determination by the Supreme Court that that decision was the product of passion, prejudice or any other arbitrary factor." 38 S. Proc., Pt. 3, 1995 Sess., p. 827, remarks of Senator Kissel; see also id., p. 828 (noting that even with removal of proportionality review, "there are still several very important safeguards built into the system which would continue to allow this state to have this sentence imposed after a great deal of scrutiny"). The House debate similarly indicates that the legislature recognizes this court's continuing obligation to engage in independent review of death sentences. See 38 H.R. Proc., Pt. 3, 1995 Sess., pp. 1090–91, remarks of Representative Michael Jarjura (stating that amendment would not require proportionality review, but amendment "would not preclude the Supreme Court from an independent review").

a competency hearing or other evidence of competency, we believe that [the defendant] may knowingly, voluntarily, and intelligently waive his right to further review of his case beyond this [c]ourt's direct review of his sentence"); *Grasso* v. *State*, 857 P.2d 802, 808 (Okla. Crim. App. 1993) (describing statutory sentence review, "which we have found to be mandatory and not subject to waiver").

The Washington Supreme Court decision in *State* v. *Dodd*, 120 Wash. 2d 1, 838 P.2d 86 (1992), is illustrative of the application of mandatory statutory review. In *Dodd*, the defendant had pleaded guilty to murdering and sexually assaulting several children, and he had elected to prevent his attorneys from presenting mitigating evidence at his sentencing proceeding. Id., 9. After he was sentenced to death, the defendant wished to waive further appellate review of his conviction and sentence. Id., 13. The Washington Supreme Court nevertheless held that the state's sentence review statute; Wash. Rev. Code Ann. § 10.95.100 (West 1990); which is similar in structure to § 53a-46b, and requires that " 'the sentence shall be reviewed on the record by the supreme court of Washington' ";[8] *State* v. *Dodd*, supra,

---

[8] Wash. Rev. Code Ann. § 10.95.100 (West 1990) provides: "Whenever a defendant is sentenced to death, upon entry of the judgment and sentence in the trial court the sentence shall be reviewed *on the record* by the supreme court of Washington." (Emphasis added.) Wash. Rev. Code Ann. § 10.95.130 (West Sup. 2000) governs the review requirements and, in addition to requiring proportionality review, provides in relevant part: "(1) The sentence review required by RCW 10.95.100 shall be in addition to any appeal. The sentence review and an appeal shall be consolidated for consideration. The defendant and the prosecuting attorney may submit briefs within the time prescribed by the court and present oral argument to the court.

"(2) With regard to the sentence review required by [chapter 138, Laws of 1981], the supreme court of Washington shall determine:

"(a) Whether there was sufficient evidence to justify the affirmative finding to the question posed by RCW 10.95.060(4); and

"(b) [Proportionality review.]

"(c) *Whether the sentence of death was brought about through passion or prejudice*; and

"(d) Whether the defendant was mentally retarded within the meaning of RCW 10.95.030(2)." (Emphasis added.)

14; imposed a sentence review process that was separate and apart from a general appeal, and was mandatory and unwaivable. Id., 14–15. The court concluded that distinctions in the statutory text between an appeal and sentence review suggested that the defendant could waive general direct appellate review, but not the separate mandatory sentence review.[9] Id., 15. The court then held that it would limit its inquiry to the statutory sentence review because the defendant was competent to waive a direct appeal, and that a next friend, therefore, lacked standing to take a direct appeal on his behalf.[10] Id., 16–18, citing *Whitmore* v. *Arkansas*, 495 U.S. 149, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990). After concluding that the state constitution did not require appellate review of a death penalty conviction beyond that prescribed by statute; *State* v. *Dodd*, supra, 22–23; the court undertook the mandatory statutory review and affirmed the death sentence, concluding that "sufficient evidence supported [the defendant's] sentence, the sentence was

I note that the Washington legislature has facilitated their state supreme court's mandatory review of all death sentences by requiring trial courts in that state to submit a detailed report about the proceedings to all parties and the high court. The report must contain comprehensive information about, for example: (1) the races and genders of those involved, including the victim and the defendant; (2) the qualifications and experience of the defendant's counsel; (3) the defendant's prior criminal record; (4) jury instructions given; (5) the nature and details of the defendant's offenses; and (6) the claimed aggravating and mitigating circumstances. See Wash. Rev. Code Ann. § 10.95.120 (West 1990).

[9] See also *State* v. *Sagastegui*, 135 Wash. 2d 67, 82, 954 P.2d 1311 (1998) ("Under *Dodd* we are required to evaluate the trial court's conclusion that [the defendant's] waiver of general appellate review was made knowingly, voluntarily, and intelligently. In the event we conclude that the waiver was valid, we must then consider the mandatory review questions posed by [the mandatory review statute] for our determination.").

[10] The Washington Supreme Court redesignated the defendant's attorneys as amici curiae to aid the court in resolving the issues, including competency, presented by the defendant's refusal to appeal. *State* v. *Dodd*, supra, 120 Wash. 2d 10. The court also appointed separate counsel to represent the defendant's interests. Id.

not excessive or disproportionate, and it was not the result of passion or prejudice."[11] Id., 28.

Having concluded that § 53a-46b imposes upon this court a responsibility to review sentences of death that exists independently of any appeal taken by the defendant, I now turn to the extent to which that statutory duty requires this court to stay the defendant's execution in the present case pending resolution of the racial discrimination claims in the consolidated habeas corpus proceedings. I, of course, recognize that this court already has conducted a comprehensive appellate review of the defendant's sentence, including proportionality review as required by General Statutes (Rev. to 1987) § 53a-46b (b) (3). See *State* v. *Ross*, 269 Conn. 213, 391–92, 849 A.2d 648 (2004), motion denied, 543 U.S. 1046, 125 S. Ct. 943, 160 L. Ed. 2d 766 (January 10, 2005). I certainly do not insinuate that the efforts of this court in that review were anything less than thorough and fair. See id., 393 (*Norcott, J.*, dissenting) ("I continue to respect the position of the majority of this court regarding this matter"). I conclude, however, that because this court has knowledge of claims of racial discrimination in the administration of the death penalty, and indeed has directed their resolution in the consolidated habeas corpus proceedings, we will not have discharged our responsibilities under § 53a-46b if we allow this execution to proceed.

I begin by noting that our review responsibilities under § 53a-46b are not confined explicitly to the record before the court. The statute provides only that "[a]ny sentence of death imposed in accordance with the pro-

---

[11] I also note that decisions in Washington issued subsequent to *State* v. *Dodd,* supra, 120 Wash. 2d 28, have elucidated that racial discrimination is considered a "passion or prejudice" factor to be considered under mandatory review. See *State* v. *Elledge,* 144 Wash. 2d 62, 83–84, 26 P.3d 271 (2001) (reviewing record and noting that defendant, victim and "all [twelve] jury members were Caucasian, so there is no issue in this case as to racial bias").

visions of section 53a-46a shall be reviewed by the Supreme Court pursuant to its rules. . . ." General Statutes § 53a-46b (a). There is no language circumscribing the scope of our sentence review, or restricting it to the review of a particular record. If the legislature had wished to limit the scope of our review obligation, it could have followed the lead of other state legislatures and done so explicitly.[12] See, e.g., Okla. Stat. Ann. tit. 21, § 701.13 (A) (West 2002) ("[w]henever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed *on the record* by the Oklahoma Court of Criminal Appeals" [emphasis added]); Va. Code Ann. § 17.1-313 (A) (Michie 1999) ("[a] sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed *on the record* by the Supreme Court" [emphasis added]); Wash. Rev. Code Ann. § 10.95.100 (West 1990) ("[w]henever a defendant is sentenced to death, upon entry of the judgment and sentence in the trial court the sentence shall be reviewed *on the record* by the supreme court of Washington" [emphasis added]). Inasmuch as it is well settled that "[w]e are not permitted to supply statutory language that the legislature may have chosen to omit"; *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 396, 618 A.2d 1340 (1993); I cannot read into the statute language restricting the scope of our review to the particular record of this defendant. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 119, 830 A.2d 1121 (2003) ("[i]f the legislature had intended to limit the application of the statute to utility property, it easily could have done so"). Moreover, a narrow reading of § 53a-46b that confines our review

---

[12] The legislature also could have followed the lead of Congress and not provided for any mandatory review at all. See *United States* v. *Hammer*, 226 F.3d 229, 235–37 (3d Cir. 2000) (discussing federal death penalty appeals statute, 18 U.S.C. § 3595), cert. denied, 532 U.S. 959, 121 S. Ct. 1488, 149 L. Ed. 2d 375 (2001).

to the trial record would be inconsistent with the maxim that "criminal statutes are to be construed strictly against the state and liberally in favor of the defendant." *In re Daniel H.*, 237 Conn. 364, 373, 678 A.2d 462 (1996). This proposition applies with equal force to statutes governing criminal procedure; see id. (construing mandatory juvenile transfer statute); and is "especially pertinent" in death penalty cases. *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986) (construing capital felony statute).

## II

### THIS COURT'S OBLIGATION TO STAY THE EXECUTION BECAUSE OF ITS INHERENT SUPERVISORY POWERS OVER THE ADMINISTRATION OF JUSTICE

I believe that not confining our review under § 53a-46b to the limited record before us, moreover, is consistent with this court's overarching " 'inherent supervisory authority over the administration of justice.' " *State* v. *Santiago*, 245 Conn. 301, 332, 715 A.2d 1 (1998); see also *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998) ("[o]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts"). "The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 332–33. "[T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks

omitted.) *State* v. *Higgins*, 265 Conn. 35, 61 n.26, 826 A.2d 1126 (2003); see also *State* v. *Coleman*, 242 Conn. 523, 540, 700 A.2d 14 (1997) ("[w]e previously have exercised our supervisory powers 'to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole' "). Moreover, it is well established that this court need not wait for a motion from a party before it exercises its supervisory powers; the court has an obligation to act sua sponte to address serious matters that may affect the "perceived fairness" of our judicial system. See, e.g., *State* v. *Santiago*, supra, 332 n.20.

The New Jersey Supreme Court decision in *State* v. *Martini*, supra, 144 N.J. 603, a case similar to the present matter, is illustrative of a state high court placing its institutional responsibilities to the administration of justice above the wishes of a particular defendant. In *Martini*, the defendant's death sentence had been affirmed on direct appeal to the state supreme court and the United States Supreme Court had denied his petition for certiorari. Id., 605–606. At that point, the defendant desired no further appeals or efforts to stop his execution, but his public defender wished to pursue state postconviction relief. Id., 606. The habeas court concluded that the defendant was competent to waive postconviction relief, and denied the public defender's motion to pursue collateral review. Id. The public defender then appealed to the state supreme court.

The court framed the issue as "whether a defendant who has presented mitigating factors to a jury and has had his conviction and sentence affirmed on direct appeal may waive post-conviction relief . . . ." Id., 609. Although the court acknowledged the state's interest in finality, it also stated that "there are some issues that one simply cannot raise on direct appeal and other

issues that are best raised" postconviction, specifically claims of ineffective assistance of counsel or other events requiring factual development beyond the trial court record. Id., 609–10. The court reviewed possible issues that might be raised on postconviction review, but particularly emphasized "evidence disclosed after [the defendant's] conviction that suggests that New Jersey's death penalty system may be constitutionally flawed because of systemic discrimination against blacks and other minorities." Id., 611.

The court stated that race discrimination "fit[s] within a traditional category for which post-conviction relief would be granted." Id., 612. It rejected the state's argument that the public defender lacked standing to raise the issue, stating that, "the question is not whether the [p]ublic [d]efender has standing to raise an issue on behalf of the defendant, but whether the judiciary, in the discharge of its constitutional and statutory duty to review every judgment of death . . . must consider the issue in order to ensure the reliability of the decision to execute." (Citation omitted; internal quotation marks omitted.) Id. The court stated that although "[i]t is a natural reaction for some to wish to be rid of an admitted murderer who asks to be executed . . . [t]he [c]ourt is nonetheless required to ensure the integrity of death sentences in New Jersey. . . . The [c]ourt must decide if issues that could not be raised on direct appeal make the prisoner's sentence of death unconstitutional or illegal." (Citations omitted.) Id., 614. Noting that its state's "history and traditions would never countenance racial disparity in capital sentencing," the court stated that it "is the appropriate branch of government to vindicate that tradition and our own constitutional guarantee of equal protection of the laws under [the state constitution]." (Internal quotation marks omitted.) Id., 616.

Noting that the habeas court properly had determined the defendant's competency to waive further proceedings; id., 617; the New Jersey court nevertheless directed mandatory postconviction relief for the defendant, after ordering the postconviction court to take judicial notice of the resolution of the then pending statistics-based racial discrimination proceedings. Id., 616. It stated that "standing is not a conceptual obstacle to the administration of justice. Thus, it is not issues of standing or waiver that determine the matter but whether the [c]ourt provides meaningful appellate review of a capital sentence when it authorizes the execution of a prisoner at the same time that it is considering whether the [d]eath [p]enalty [a]ct is constitutional. It seems to us that the answer to that question must be no unless we no longer believe that it is self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty."[13] (Internal quotation marks omitted.) Id., 616–17.

I find that the New Jersey Supreme Court decision in *State* v. *Martini*, supra, 144 N.J. 603, provides exemplary guidance to this court in the discharge of our obligations.[14] It pragmatically acknowledges that "we

---

[13] I note, however, that unlike the court in *Martini*, I only would order a stay of the defendant's execution pending resolution of the consolidated habeas corpus proceedings. I would not require this particular defendant to take any further action on his own behalf prior to the disposition of those proceedings. See also footnote 19 of this dissenting opinion.

[14] At oral argument before this court in the writ of error brought by Dan Ross, the state argued that *State* v. *Martini*, supra 144 N.J. 603, is no longer a good precedent and that its approach has in fact been rejected by other states. My independent research shows that *Martini* is still good law in New Jersey, and that its approach requiring a competent defendant to undertake a collateral review of his conviction has been explicitly rejected by only one court, an intermediate appeals court whose decision presently is under review by the state's highest court. See *Pike* v. *State*, Docket No. E2002-00766-CCA-R3-PD, 2004 Tenn. Crim. App. LEXIS 635, *43 (July 15, 2004), appeal granted, Docket No. E2002-00766-SC-R11-PD, 2004 Tenn. LEXIS 1034 (November 22, 2004).

cannot stay scheduled executions for each new issue that arises" as "[t]here must be an end to the process," and that "someone will die before every avenue of inquiry will have been ended . . . ." Id., 614. I, of course, recognize that, at some point, the appeals process must stop for all, including capital defendants. Indeed, I do not read § 53a-46b as requiring this court to be a sua sponte fountain of infinite creativity in devising ways to invalidate death sentences. Nevertheless, I, like the majority in *Martini*, have grave reservations about permitting an execution to proceed when we have actual knowledge of pending claims that the entire death penalty system may be flawed as racially discriminatory. See *State* v. *Ross*, supra, 272 Conn. 616 n.4 (*Norcott, J.*, concurring) ("[m]y trepidation transcends the defendant in this case because our concerns of racial discrimination in the administration of Connecticut's death penalty are not the product of conjecture informed by the voracious consumption of law review articles"). Indeed, it is this very court that ordered the claims consolidated into one habeas corpus proceeding. As I stated previously, "[m]y concern is that to permit an execution to proceed without the benefit of the completion of that study and a ruling thereon amounts to an informal and premature judicial imprimatur on the fairness of the death penalty process. Moreover, should the habeas court subsequently conclude that our entire death penalty system is fundamentally flawed as discriminatory on the basis of race *after* the defendant has been executed, our citizens' confidence in this court and the rest of the judicial branch as a bastion of civil rights might suffer irreparable harm." (Emphasis in original.) Id., 615–16 (*Norcott, J.*, concurring); cf. *Commonwealth* v. *McKenna*, 476 Pa. 428, 441–42, 383 A.2d 174 (1978) (concluding sua sponte that defendant could not be executed under facially unconstitutional death penalty statute, although defendant refused to raise issue at trial or on appeal).

III

## THE IMPLICATIONS FOR THIS DEFENDANT OF THE RACIAL DISCRIMINATION CLAIMS PENDING IN THE CONSOLIDATED HABEAS CORPUS PROCEEDINGS

I also must address the apparent counterargument that there is no hint of racial discrimination in the present case because the defendant and his victims were white, and that the defendant has in fact elected not to participate in the consolidated habeas corpus proceedings. That is irrelevant. If the defendants who have chosen to participate in the consolidated habeas corpus proceedings are successful, it will be because they will have proven that the administration of the facially non-discriminatory death penalty statutes violates the equal protection rights guaranteed to all defendants by our state constitution, specifically article first, § 20, as amended by articles five and twenty-one of the amendments, as well as the state constitution's prohibition of cruel and unusual punishment under article first, §§ 8 and 9.[15] Although this court's cases generally have confined "as applied" analysis to the fact-specific scenario presented by the particular party challenging legislation,[16] the scope of the racial discrimination review cur-

---

[15] Article first, § 20, of the constitution of Connecticut, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ." Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." "[I]t is settled constitutional doctrine that, independently of federal constitutional requirements, our due process clauses, because they prohibit cruel and unusual punishment, impose constitutional limits on the imposition of the death penalty." *State* v. *Rizzo*, supra, 266 Conn. 206.

[16] See *Roth* v. *Weston*, 259 Conn. 202, 205–206, 789 A.2d 431 (2002) ("[w]e conclude that [General Statutes § 46b-59] is unconstitutional as applied to

rently underway in the consolidated habeas corpus proceedings necessarily would require, if those defendants are to prevail, analysis of the application of the death penalty statutes to *all* capital defendants, not only individuals.[17]

I recognize that the United States Supreme Court has rejected the use of detailed statistical evidence to prove discriminatory application of Georgia's death penalty scheme, and has required a more particularized showing of "purposeful discrimination" with respect to specific defendants in order to establish violations of the eighth or fourteenth amendments to the federal constitution. *McCleskey* v. *Kemp*, 481 U.S. 279, 297, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) ("we hold that the [statistical study conducted by Professor David C. Baldus on the influence of race in death penalty sentences] is clearly insufficient to support an inference that any of the decisionmakers in [the defendant's] case acted with discriminatory purpose");[18] see also, e.g., *Bell* v.

the extent that the trial court, pursuant to the statute, permitted third party visitation contrary to the desires of a fit parent and in the absence of any allegation and proof by clear and convincing evidence that the children would suffer actual, significant harm if deprived of the visitation"); *Shawmut Bank, N.A.* v. *Valley Farms*, 222 Conn. 361, 369, 610 A.2d 652 ("[w]e therefore view the question of the constitutionality of the statutes at issue as applied under the facts of this case"), cert. dismissed, 505 U.S. 1247, 113 S. Ct. 28, 120 L. Ed. 2d 952 (1992); *State* v. *Ayala*, 222 Conn. 331, 344 n.12, 610 A.2d 1162 (1992) ("[b]ecause certification was granted to consider only the application of the statute to this defendant, we need not consider in this appeal whether the application of [General Statutes] § 54-64f [providing for bail revocation on subsequent arrest] to another defendant under different circumstances might result in a deprivation of constitutional rights").

[17] This analysis should not be taken as any kind of prejudgment or premature imprimatur of the racial discrimination claims pending in the consolidated habeas corpus proceedings. I offer it only to explain why the potential success of those claims requires the postponement of the execution of the defendant.

[18] See also *McCleskey* v. *Kemp*, supra, 481 U.S. 292–93 ("Thus, to prevail under the [e]qual [p]rotection [c]lause, [the defendant] must prove that the decisionmakers in his case acted with discriminatory purpose. He offers no evidence specific to his own case that would support an inference that

*Ozmint*, 332 F.3d 229, 237–39 (4th Cir. 2003) (following *McCleskey* and rejecting county-specific study because it failed to address nondiscriminatory reasons for seeking death penalty), cert. denied, 540 U.S. 1153, 124 S. Ct. 1155, 157 L. Ed. 2d 1049 (2004).

It is not, however, settled that this court will follow *McCleskey's* restrictive approach. It potentially may take a more charitable view under the state constitution toward the use of statistical evidence to prove the discriminatory application of Connecticut's death penalty statutes. See *City Recycling, Inc.* v. *State*, 257 Conn. 429, 444, 778 A.2d 77 (2001) ("[a]lthough we previously have stated that the equal protection provision under our state constitution provides the same limitations as the federal equal protection provision . . . we note here . . . that this does not mean that 'the state equal protection provision can *never* have an independent meaning from the equal protection provision in the federal constitution' " [citations omitted; emphasis in original]). Indeed, I recognize that *McCleskey* has been the target of more than some academic criticism; see, e.g., J. Blume, T. Eisenberg & S. Johnson, "Post-*McCleskey* Racial Discrimination Claims in Capital Cases," 83 Cornell L. Rev. 1771 (1998); and more significantly, that at least one other state has rejected it as a matter of state constitutional law, allowing, but not yet validating challenges to the death penalty based solely on statistical proof. See *State* v. *Loftin*, 157 N.J. 253, 298, 724 A.2d 129 (1999); *State* v. *Marshall*, 130 N.J. 109, 207, 613 A.2d 1059 (1992), cert. denied, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 694 (1993).

I am well aware that statutes are subject to a heavy presumption of constitutionality. See, e.g., *Donahue* v. *Southington*, 259 Conn. 783, 794, 792 A.2d 76 (2002). I

racial considerations played a part in his sentence. Instead, he relies solely on the Baldus study.").

also recognize the difficulty of proving impermissible discrimination based solely on statistical evidence. We cannot, however, ignore the fact that these claims exist and that their consideration is currently pending in consolidated habeas corpus proceedings being supervised by this court. Moreover, the scope of these discrimination claims, as described in this court's published decisions, indicates that a successful statistics-based "as applied" challenge necessarily will have results beyond the scope of individual cases. See *State* v. *Reynolds,* supra, 264 Conn. 228, 230 (noting that defendant "suggest[s] that the death penalty is imposed in a racially discriminatory and arbitrary manner in this state" and "we agree with the defendant that he was entitled to an evidentiary hearing for the purpose of presenting facts in support of his claim that, notwithstanding the jury verdict, he should be sentenced to life imprisonment without the possibility of release because of the allegedly flawed manner in which this state's death penalty statute is implemented"); *State* v. *Cobb,* supra, 234 Conn. 763 (noting "the nature of the defendant's claim of *systemic* racial bias" [emphasis added]); see also id., 769 (*Berdon, J.,* dissenting) (noting that "the state concedes that if the defendant is correct, and if reliable statistics demonstrate that *defendants* are being subjected to the death penalty on the basis of their race, the death penalty system would be 'unconstitutional as applied' " [emphasis added]). Indeed, this court recognized that reality in *State* v. *Reynolds,* supra, 233, when it characterized the consolidated habeas corpus proceedings as "on behalf of all defendants who have been sentenced to death."[19]

---

[19] I recognize that there is language in the recent decision in *State* v. *Colon,* 272 Conn. 106, 864 A.2d 666 (2004), that implies that participation in the consolidated habeas study is an option that is personal to an individual defendant. See id., 379 ("if the defendant intends to pursue [a racial discrimination] claim, he must do so in a subsequent habeas corpus proceeding"). I do not believe, however, that this conclusion means ineluctably that a defendant who has elected not to participate in that litigation may nevertheless be executed if the study proves that our death penalty is administered

Indeed, other states have held that *McCleskey* type claims amount to "as applied" challenges with respect to, for example, "black defendants," and not just a specific defendant. See *Stephens* v. *State*, 265 Ga. 356, 358, 456 S.E.2d 560 (following *McCleskey* and concluding that statistics alone did not prove mandatory life imprisonment statute for second drug sale was applied unconstitutionally under federal constitution, but "defer[ed] deciding whether statistical evidence alone can ever be sufficient to prove an allegation of discriminatory intent in sentencing under the Georgia [c]onstitution" because of perceived shortcomings in study), cert. denied, 516 U.S. 849, 116 S. Ct. 144, 133 L. Ed. 2d 90 (1995); id., 358 n.2 (citing cases from other jurisdictions that relied on state constitutions to invalidate criminal statutes that imposed disproportionate burden on black defendants); *Underwood* v. *State*, 708 So. 2d 18, 38 (Miss. 1998) (stating that defendant "failed to offer any substantial proof that the death penalty is applied in a discriminatory manner in Mississippi today, *or* that he suffered discriminatory application of the law" [emphasis

in a racially discriminatory manner. See *Commonwealth* v. *McKenna*, supra, 476 Pa. 433 (refusing to permit execution under clearly unconstitutional death penalty statute, defendant's "professed desire to the contrary notwithstanding"). Read in context, I submit that the language in *Colon* stands for the proposition that the defendant in that case was not entitled, during his initial trial, to a "continuance of his sentencing [or] a hearing to determine whether racial disparities in the administration of the death penalty statute violated his constitutional rights and the statutory requirement that a death sentence not be 'the product of passion, prejudice or any other arbitrary factor' . . . ." *State* v. *Colon*, supra, 377. Rather, we followed *Reynolds* and concluded that the need for a complete factual record with respect to his discrimination claims necessitated review of those claims in a subsequent habeas corpus proceeding, rather than at trial. Id., 378–79. Put differently, while a defendant and his counsel are not obligated to jump in and help with the consolidated habeas corpus proceedings, that defendant cannot exclude himself from the effect of the ultimate legal conclusion that will result from those proceedings. Accordingly, I would not permit the defendant in the present case to play "beat the clock" and voluntarily subject himself to lethal injection before we know the result of the racial discrimination study.

added]);[20] *State* v. *Keene,* 81 Ohio St. 3d 646, 654, 693 N.E.2d 246 (1998) (following *McCleskey* and rejecting federal statistics-based claim, and declining to construe state constitution "to require a finding of racially biased charging decisions in capital cases 'upon a showing of disparate impact, without a need to prove the prosecutor's subjective intent' " because of inadequate briefing); cf. *State* v. *Hairston,* 133 Idaho 496, 517–18, 988 P.2d 1170 (1999) (rejecting claim based solely on statistical study demonstrating that state's death penalty is applied significantly more often in urban counties, but not expressly requiring individualized proof), cert. denied, 529 U.S. 1134, 120 S. Ct. 2014, 146 L. Ed. 2d 963 (2000); but see *Foster* v. *State,* 614 So. 2d 455, 463 (Fla. 1992) (following *McCleskey* and rejecting statistics-based claim based on practices of specific county prosecutors' office because defendant "has offered nothing to suggest that the state attorney's office acted with purposeful discrimination in seeking the death penalty in his case"), cert. denied, 510 U.S. 951, 114 S. Ct. 398, 126 L. Ed. 2d 346 (1993); *State* v. *Woods,* 143 Wash. 2d 561, 620–21, 23 P.3d 1046 (following *McCleskey* and rejecting defendant's statistics-based claims of racial discrimination in administration of death penalty at county level), cert. denied, 534 U.S. 964, 122 S. Ct. 374, 151 L. Ed. 2d 285 (2001).[21] Needless to say, if we take

---

[20] In *Underwood,* the Mississippi Supreme Court called "insufficient statistical evidence" "statistics from the NAACP Legal Defense Fund from January 31, 1995, showing that thirty-two of Mississippi's fifty-three death row inmates at the time, 60%, were black, while only 36% of Mississippi's general population was black. At the motions hearing on May 5, [the defendant] submitted a list of Mississippi's death row inmates dated March 25, 1995, showing that thirty-six of the fifty-eight inmates (62%) were black. Out of these thirty-six, twenty-one (58%) had victimized whites. Forty-one of the fifty-eight death row inmates (71%) had white victims." *Underwood* v. *State,* supra, 708 So. 2d 37–38.

[21] In *State* v. *Woods,* supra, 143 Wash. 2d 619, the defendant alleged that his death sentence was a result of "passion or prejudice" because in the county where he was prosecuted, " 'the state has sought death in every aggravated murder case in which the defendant was black, but only in 20% of the cases in which the defendant was white.' " The defendant argued that

a broader approach to statistical claims under our state constitution than that endorsed in *McCleskey*, and ultimately conclude that the death penalty is discriminatory, the remedy obviously could not be limited to minorities only. The death penalty necessarily would need to be stricken with respect to all defendants, including the defendant in the present case.

In this case, the defendant's wishes and "dignity [stand] against the dignity of the law." R. Bonnie, "The Dignity of the Condemned," 74 Va. L. Rev. 1363, 1377 (1988).[22] I would conclude that this court has a statutory and institutional obligation to uphold the dignity of our state laws, and stay the defendant's execution pending resolution of the racial discrimination claims in the consolidated habeas corpus proceedings.

Accordingly, I respectfully dissent from the court's order dismissing the motions to stay the execution.

---

an inference of discrimination was supported by anecdotal evidence of racism in the county and the fact that all of the potential jurors were white. Id. The Washington Supreme Court relied on *McCleskey* v. *Kemp*, supra, 481 U.S. 279, and concluded that the statistical sample offered by the defendant was less persuasive than that rejected in *McCleskey* because of its small size of thirteen defendants, even when combined with allegations of racism in the community at large. *State* v. *Woods*, supra, 620–21. The court also noted that the "jury deliberated for two days before reaching its decision to impose the death sentence," and that if it was "motivated by racial prejudice," it likely would have reached a verdict faster. Id., 621.

[22] Professor Bonnie notes that the present case leaves us with "competing moral intuitions. Is it 'wrong' to carry out a death sentence in the face of unresolved doubts about its validity? Is it 'wrong' to ignore the wishes of the condemned prisoner who wants the state to carry out its promises? The prisoner's dignity stands against the dignity of the law. Should the choice of whether or not to terminate the process of judicial review be left to the prisoner, or should this decision be taken out of his hands." R. Bonnie, supra, 74 Va. L. Rev. 1376–77. Professor Bonnie, however, advocated a more circumscribed review than we suggest herein because he "believe[s] that the prisoner's interest in controlling his own fate should be subordinated to a societal interest in the integrity of the legal process only in situations in which it is necessary to assure that the prisoner has committed an offense for which the death penalty has been prescribed." Id., 1390–91.

LAVERY and DRANGINIS, Js., dissenting from the order. We dissent from the order of the court dismissing the motions to stay the execution. We agree with the majority that the plaintiffs in error, the office of the chief public defender and Dan Ross, Michael Ross' father, lack standing to raise claims on behalf of the defendant, Michael Ross. We nevertheless would grant a stay of execution, sua sponte, because we disagree with the majority that an individual defendant can waive the benefit of any potential relief resulting from the disposition of the pending consolidated habeas corpus litigation that questions whether the administration of Connecticut's death penalty system comports with the state constitution, which consolidated litigation was ordered by this court in *State* v. *Reynolds*, 264 Conn. 1, 233, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004), to be litigated on behalf of all death sentenced defendants. Although the defendant is free to waive possible claims of error specific to his own prosecution, it does not follow that he should be permitted to waive the public's overriding interest in a system of capital punishment that is fairly, justly and evenly imposed. We conclude that this court's supervisory authority over the administration of justice empowers it to issue a stay when, as here, there is an active systemic challenge implicating the reliability of the most final of sentences. We further conclude that the statutory mandate that this court review all capital sentences to determine whether they are the product of passion, prejudice or any other arbitrary factor; see General Statutes § 53a-46b (b) (1); requires us to issue a stay until this court has reviewed the conclusions reached by the habeas court.

As fully explicated in Justice Norcott's dissent, Connecticut's death penalty statutes require mandatory review of all capital sentences, regardless of whether any individual defendant takes a direct appeal from his

or her conviction for a capital offense. See id.; see also *Whitmore* v. *Arkansas*, 495 U.S. 149, 174 n.1, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990) (Marshall, J., dissenting) (listing Connecticut's statute among those that provide for mandatory review of capital sentences); *State* v. *Webb*, 238 Conn. 389, 394 n.9, 680 A.2d 147 (1996) ("defendant . . . also seeks review of the sentence of death pursuant to General Statutes § 53a-46b, which provides for mandatory review by this court of any sentence of death"); 23 H.R. Proc., Pt. 9, 1980 Sess., p. 2768, remarks of Representative Richard D. Tulisano ("[our death penalty statute] also mandates that there be an automatic review by the Connecticut Supreme Court in order to affirm any death sentence which may be imposed on anybody"). Included in the court's mandatory review is the obligation to determine whether the "sentence was the product of passion, prejudice or any other arbitrary factor . . . ." General Statutes § 53a-46b (b) (1). This court previously has stated that this subsection, insofar as it provides for meaningful appellate review, is one of the features of our statutory scheme that brings it in accord with the federal constitution. *State* v. *Cobb*, 251 Conn. 285, 478, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000), citing *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). The claims ordered to be litigated in the consolidated habeas corpus proceedings arise under this subsection and, therefore, are subject to mandatory review.

Through our evolving death penalty jurisprudence, it has been established that a claim of systemic unconstitutional bias or arbitrariness in the administration of Connecticut's death penalty should be raised under § 53a-46b (b) (1); *State* v. *Cobb*, 234 Conn. 735, 738, 741, 663 A.2d 948 (1995) (raising claim that "the death penalty scheme has been disproportionately applied to black defendants or to defendants whose victims were

white"); and, further, that the sole appropriate forum in which to make this claim is in one consolidated habeas corpus proceeding to be litigated "on behalf of *all* defendants who have been sentenced to death." (Emphasis added.) *State* v. *Reynolds*, supra, 264 Conn. 226–28, 232–34 (raising claim that "the influence of race and other arbitrary factors on the imposition of capital punishment [throughout] Connecticut" resulted in sentences that were the product of prejudice and other arbitrary factors in violation of § 53a-46b [b] [1] and the equal protection and due process provisions of our state constitution). This litigation thus has evolved into a systemic challenge to the alleged unconstitutional application of our death penalty statute, thereby implicating society's right in the fair administration of justice.

Although his inclusion clearly is contemplated by the order in *Reynolds,* the defendant in this matter has expressed his willingness to waive participation in the consolidated habeas proceeding. Although criminal defendants routinely are permitted to waive various constitutional rights intended for their personal protection, it nevertheless is fundamental that no one individual is entitled to waive the interests of the public as a whole.[1] "[W]aiver, from its nature, applies ordinarily to all rights or privileges to which a person is legally entitled, *provided such rights or privileges belong to the individual and are intended solely for his benefit.* A waiver is not, however, allowed to operate so as to infringe upon the rights of others, or to transgress public policy or morals.

"The public interest may not be waived. Where a law seeks to protect the public as well as the individual,

---

[1] This analysis of an individual's inability to waive a public right, or a right in which the public is intricately invested, is distinct from but supplements the conclusion that Justice Norcott reaches in determining that § 53a-46b provides for mandatory sentence review which, by its nature, is not subject to waiver.

such protection to the state cannot, at will, be waived by any individual, an integral part thereof. The public good is entitled to protection and consideration and if, in order to effectuate that object, there must be enforced protection to the individual, such individual must submit to such enforced protection for the public good." (Emphasis added.) 28 Am. Jur. 2d Estoppel and Waiver § 161 (1966) (citing cases). Accordingly, a statutory "right conferred on a private party, but affecting the public interest, may not be waived or released *if such waiver or release contravenes the statutory policy*." (Emphasis in original; internal quotation marks omitted.) *New York* v. *Hill*, 528 U.S. 110, 116, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000), quoting *Brooklyn Savings Bank* v. *O'Neil*, 324 U.S. 697, 704, 65 S. Ct. 895, 89 L. Ed. 2d 1296 (1945); see also *Hatch* v. *Merigold*, 119 Conn. 339, 343, 176 A. 266 (1935) ("[o]ne cannot waive a public obligation created by statute"); *Haggerty* v. *Williams*, 84 Conn. App. 675, 681, 855 A.2d 264 (2004) ("[b]ecause of the combined private and public interests involved, individual parties are not entirely free to waive [a statute of limitations defense]"). Further, the institutional interest of a court in reaching just verdicts through fair processes justifies its disallowance of knowing and voluntary attempts to waive purportedly personal constitutional rights. See, e.g., *United States* v. *Scalzitti*, 578 F.2d 507, 511–12 (3rd Cir. 1978) (disallowing defendant's waiver of requirement of unanimous jury verdict); *State* v. *Crocker*, 83 Conn. App. 615, 631, 852 A.2d 762, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004) (disallowing defendant's waiver of his counsel's conflict of interest).

It is beyond question that *all citizens* of this state share an interest in a constitutionally administered system of capital punishment, uninfluenced by factors such as race, and, by extension, in any proceeding raising systemic challenges based on the racially biased appli-

cation of that system. As noted by the New Jersey Supreme Court in a case mandating that a death sentenced prisoner pursue an expedited individualized postconviction relief application and, further, requiring that his execution be stayed until the resolution of a systemic constitutional challenge to that state's death penalty system brought by another prisoner, "[t]he public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants." *State* v. *Martini*, 144 N.J. 603, 605, 677 A.2d 1106 (1996), cert. denied, 519 U.S. 1063, 117 S. Ct. 699, 136 L. Ed. 2d 621 (1997); see also *Massie* v. *Sumner*, 624 F.2d 72, 74 (9th Cir. 1980) (noting state's "strong interest in the accuracy and fairness of all its criminal proceedings" in disallowing death sentenced prisoner's request to waive statutorily mandated direct appeal); *People* v. *Stanworth*, 71 Cal. 2d 820, 834, 457 P.2d 889, 80 Cal. Rptr. 49 (1969) (holding state "has an indisputable interest [in death penalty appeal] which the appellant cannot extinguish"); *State* v. *Koedatich*, 112 N.J. 225, 332, 548 A.2d 939 (1988) ("[i]t is self-evident that the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty").

The public's interest in ensuring that Connecticut's death penalty is administered in a manner that comports with our constitution is embodied in the mandatory sentence review requirement of § 53a-46b. Our jurisprudence has established that claims of systemic bias are cognizable under § 53a-46b (b) (1) and that the sole forum in which these claims will be considered is the consolidated habeas corpus proceeding ordered by this court in *State* v. *Reynolds*, supra, 264 Conn. 233. By ordering this proceeding to be held on behalf of all death sentenced prisoners, we have conferred upon the defendant the personal rights both to participate therein and to benefit from any potential relief that might issue.

The defendant's personal stake in the outcome of this proceeding is clear; the public's interest and independent stake in this proceeding is equally apparent. If this proceeding leads to a determination that Connecticut's death penalty system has been administered prejudicially or arbitrarily, all prisoners sentenced thereunder would have their sentences commuted to life imprisonment. See General Statutes §§ 53a-46b (a) and (b) and 53a-35a (1). In a case involving life and death, prematurely permitting an individual defendant to waive the benefit of such a proceeding could lead to irreversible damage to the public interest in the fair administration of society's ultimate penalty. In light of the public's independent interest, the defendant's waiver of his private interest is legally irrelevant. "In this regard we are not concerned with the defendant's welfare, but rather [with] the operation of our system." *Commonwealth* v. *McKenna*, 476 Pa. 428, 445 n.7, 383 A.2d 174 (1978) (Nix, J., concurring).

Accordingly, we respectfully dissent from the court's order dismissing the motions to stay the execution.

